**Joseph DATLOF, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 31805.**

United States District Court
E. D. Pennsylvania.

March 24, 1966.

---

Robert M. Taylor, Philadelphia, Pa., for plaintiff.

Sullivan Cistone, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

JOHN W. LORD, Jr., District Judge.

This is a civil non-jury action for a refund of $81.90, being a sum which was paid by plaintiff Joseph Datlof as the result of an assessment against him for unpaid federal withholding and employment tax obligations by the Commissioner of Internal Revenue under the provisions of Section 6672 of the Internal Revenue Code of 1954. The defendant has filed a counterclaim to collect the remaining unpaid balance on this assessment in the amount of $31,499.45.

Trial was had before my late colleague, Judge Allan K. Grim, on May 11, 12, 17 and 18, 1965. His unfortunate death in December, 1965, however, prevented him from filing Findings of Fact and Conclusions of Law.

The case was thereafter referred to me for decision. It was agreed by both parties that no further testimony would be offered and that I could make Findings of Fact and Conclusions of Law on the Record now before me. See Finding No. 10 below.

Accordingly, after considering the entire record, briefs and arguments of counsel, I make the following

### FINDINGS OF FACT

1. Mr. Joseph Datlof is a citizen of the United States and of the State of Pennsylvania. (Stip. par. 1.) Mr. Datlof was the president and treasurer of the Donchester Manufacturing Company during the entire period when that firm was in existence. (Stip. par. 3; Tr. 25, 86; see also, Deft. Ex. 1, minutes of meeting of November 9, 1945.)

2. Donchester was a corporation which was organized under the laws of the State of Delaware on or about October 25, 1945. (Stip. par. 3; Tr. 86; Deft. Ex. 1.) From late 1945 until about December 31, 1955, this firm was engaged in the business of making clothing. During the three quarters of the calendar year 1955 which are in issue in this case, the corporate premises were located on the third, fourth, and fifth floors of the Pilling Building, at 23rd and Arch Streets in Philadelphia, Pennsylvania. (Stip. par. 3.)

3. The Donchester Manufacturing Company employed about 460 individuals.

(See line 4 of Pltf. Exs. 10, 11, and 12.) Federal income and employment taxes were withheld from the wages of these employees in the normal course of Donchester's business. (Tr. 49–51.) However, not all of these withheld taxes were paid over by Donchester to the United States Government. At the time when Donchester ceased active operations at the end of the year 1955, the following amounts of employees' withholding and Federal Insurance Contribution Act taxes were due and owing from that firm. (Stip. pars. 4, 5; Stip. Ex. A.)

### Table 1

Employees' Withholding and
F.I.C.A. Taxes Collected by
Donchester Manufacturing
Company but Not Paid to
Government

| Quarter Ending | Amount Owed | Stipulation Reference |
|---|---|---|
| June 30, 1955 | $10,632.08 | Ex. A, p. 2 |
| September 30, 1955 | $14,798.45 | Ex. A, p. 3 |
| December 31, 1955 | $12,273.57 | Ex. A, p. 4 |
| Total | $37,704.10 | |

4. On September 30, 1957, the Commissioner of Internal Revenue assessed a 100% penalty under the provisions of Section 6672 of the Internal Revenue Code of 1954 against the individuals who were officers of the Donchester Manufacturing Company during the year 1955.

The Commissioner's September 30, 1957 penalty assessment was timely assessed against both the plaintiff, Joseph Datlof, in his capacity as President and Treasurer of Donchester, and against one Samuel L. Schwartz, who was the Vice-President and Secretary of Donchester. (Stip. par. 5; Deft. Ex. 1, minutes of meeting of February 21, 1955.) The original assessment was in the amount of $44,405.10, but this sum was subsequently abated by $6,701.00 as a result of the identification of certain payments of tax in that amount which had been made by Donchester shortly before it went out of business. (Stip. par. 5 and Stip. Ex. C.) As thus reduced, the amount of the joint and several assessment against Mr. Datlof and Mr. Schwartz came to $37,704.10, which is the same as the amount of the unpaid withholding and employment tax liabilities of the Donchester Manufacturing Company. (Stip. par. 4; Stip. Ex. A; and Table 1, supra.)

5. Subsequent to the assessment and abatement described in the previous paragraph, Mr. Samuel Schwartz paid $3,640.00 in settlement of the assessment against him. In addition, the Government collected $2,482.75 out of the proceeds of a suit which had been commenced by Donchester in July 1955 against Bernard Stoumen Trading as Brentwood Knitting Mills. (Stip. par. 5; Tr. 172.) Finally, the Government received a payment in the amount of $81.90 from Mr. Joseph Datlof. (Stip. par. 5.) It is this $81.90 payment which Mr. Datlof seeks to recover in this suit.

6. As a result of the payments described in the previous paragraph, the amount of the unpaid balance on the Commissioner's September 30, 1957, penalty assessment has been reduced to $31,499.45, which is the amount of the Government's counterclaim in this action. (Stip.

par. 5.) Table 2 below, sets forth the amount of the Government's original assessment, and the amounts of the abatements and payments described above.

Table 2

Abatements and Payments on
Commissioner's Deficiency
Assessment of September 30, 1957

| | | |
|---|---|---|
| Original Assessment ............................... | | $44,405.10 |
| (September 30, 1957) | | |
| *Less* Abatement as a result of identification of two previously unidentified payments of tax by Donchester .................... | $6,701.00 | 6,701.00 |
| Amount Unpaid as of January 17, 1958 ................ | | $37,704.10 |
| *Less* Schwartz Settlement Payment ...................... | $3,640.00 | |
| Proceeds of Suit Against Brentwood .................... | $2,482.75 | |
| Datlof Payment (Refund Demanded in Complaint) ......... | $ 81.90 | |
| Total | $6,204.65 | 6,204.65 |
| Unpaid Balance on Assessment (Amount of Gov't Counterclaim ............................ | | $31,499.45 |

———◆———

7. Mr. Datlof paid the sum of $81.90 (as set forth in Table 2, above) on October 23, 1961. (Stip. Ex. C.) On December 8, 1961, he filed a claim for a refund of that amount. (Pltf. Ex. 13.) This claim was disallowed in full on April 18, 1962. (Pltf. Ex. 22.) Thereafter, this suit was commenced on July 27, 1962. (Stip. par. 6.) In its answer to Mr. Datlof's complaint, the Government asserted a counterclaim for the unpaid balance on its September 30, 1957 deficiency assessment, in the amount of $31,499.45. *Ibid.*

8. This case was tried to the Court on May 11, 12, 17, and 18, 1965. Three witnesses were called by the taxpayer. These were Miss Doris Shaftman, the bookkeeper-secretary for the Donchester Manufacturing Company (Tr. 21), Mr. Samuel Cohen, an electrician for Donchester (Tr. 62), and Mr. Datlof himself. The Government called five witnesses. These were Mr. Joseph Datlof; Mr. Al-

fred C. Achtert, assistant treasurer of the Broad Street Trust Company (Tr. 309), Mr. Irvin Sklar, a partner in the Philadelphia accounting firm of Sklar, Carmosin & Company (Tr. 520), and Mr. Fred J. Isaacson and Mr. Richard Frankfort, who are now officers of a New York clothing firm known as Donmoor-Isaacson (Tr. 535), and who formed a Pennsylvania corporation in the year 1955 which was known as Peay Manufacturing Company (Tr. 537, 539). During the last half of the year 1955, the Donchester Manufacturing Company produced garments for Peay Manufacturing. (Tr. 146, 555–557.) Mr. Isaacson and Mr. Frankfort appeared by deposition, since it was agreed that they were beyond subpoena range. (Tr. 375 & esp. 381.)

9. At the trial, the Taxpayer marked Plaintiff's Exhibits 1 through 29 for identification, and all of these exhibits were received in evidence. The Govern-

ment marked defendant's Exhibits 1 through 18 for identification. All of these exhibits were admitted, except for Exhibits 8, 9, and 10, which were withdrawn when Exhibit 12 was admitted; Exhibit 16, which became unnecessary when the taxpayer withdrew its objection to the reading into evidence of the joint deposition of Mr. Isaacson and Mr. Frankfort (Tr. 381); and Exhibit 18, which was designed for the sole purpose of assisting the Court in taking judicial notice of the fact that October 5, 1955 was a Wednesday. (See Tr. 412–416.)

10. Subsequent to the passing of the Honorable Allan K. Grim on December 7, 1965, the parties executed a stipulation in which they indicated that this case could be decided on the basis of the record, as theretofore established, including the pleadings, the stipulation filed on May 12, 1965, the trial transcript, and the admitted trial exhibits. This stipulation was filed with the Court on December 30, 1965.

## A BRIEF HISTORY OF THE DONCHESTER MANUFACTURING COMPANY

11. The Donchester Manufacturing Company was organized on October 25, 1945 (Deft. Ex. 1, pp. 1–5.) An agreement to form this corporation (Pltf. Ex. 7) had been drawn up in the year 1944 by Mr. Datlof's attorney (Tr. 387), but Donchester did not go into operation under the terms of this 1944 agreement. (Tr. 391–392.) After Mr. Datlof returned from wartime service, a new agreement to form a corporation was drawn up in 1945 (Pltf. Ex. 8), and it was under the terms of this incorporator's agreement that Donchester came into existence on October 25, 1945. (Stip. Ex. 1.)

12. The original stockholders of the Donchester Manufacturing Company were Mr. Joseph Datlof (who held 50 shares of voting stock), and two brothers, Bernard and Abraham Stoumen (who held the remaining 50 shares of voting stock). In addition, Mr. Samuel L. Schwartz held 50 shares of nonvoting stock. (Deft. Ex. 1, minutes of meeting of November 9, 1945; Tr. 76.) The purpose of this arrangement was to insure that no corporate action could be taken without Mr. Datlof's approval. (Tr. 77.)

13. Subsequently, in the year 1947, Mr. Abraham Stoumen died (Tr. 89), and a reorganization of the capital structure of Donchester was undertaken. (Tr. 90, Deft. Ex. 1, minutes of meeting of May 20, 1948.) After this reorganization, Abraham Stoumen's widow owned one-twelfth of the outstanding capital stock of Donchester. (Tr. 91.) The remaining eleven-twelfths were divided in equal shares between Mr. Joseph Datlof, Mr. Bernard Stoumen, and Mr. Samuel Schwartz. (Tr. 91.) No further changes were made in the capital structure of the Donchester Manufacturing Company (Tr. 90), prior to the time when that firm ceased operations at the end of the year 1955. (Stip. par. 4.)

14. After the corporate reorganization described in the previous paragraph, all of the stock of Donchester (except for that owned by the widow of Abraham Stoumen) was placed in a voting trust. (Tr. 447; Pltf. Ex. 8, addendum.) One of the purposes of this voting trust was to insure that all of the stockholders of Donchester were in agreement on any change in company policy. (Tr. 448.) Consequently, Mr. Datlof could not be outvoted by Mr. Stoumen and Mr. Schwartz.

15. The original directors of the Donchester Manufacturing Company were Mr. Joseph Datlof, Mr. Samuel Schwartz, and Mr. Harold Goodman. (Deft. Ex. 1, minutes of meeting of November 9, 1945.) However, at a later date, Mr. Goodman was replaced by Wesley H. Caldwell, Esquire. (Deft. Ex. 1, minutes of meeting of September 25, 1946; Tr. 87.) From that date forward, there was no further change in the membership of Donchester's Board of Directors. Mr. Schwartz offered his resignation from the Board in a letter dated December 21, 1955, but this resignation was not accepted, and Mr. Schwartz continued to serve as a board member until Donchester

ceased to exist. (Deft. Ex. 1, minutes of meeting of December 21, 1955 and January 11, 1956.)

16. At the time of Donchester's organization, Mr. Joseph Datlof was elected president and treasurer, and Mr. Samuel Schwartz was elected secretary. (Deft. Ex. 1, minutes of meeting of November 9, 1945.) At a later date, Mr. Schwartz was made both vice-president and secretary of the firm. (*Ibid.*, minutes of meeting of February 3, 1953.) However, there was never any change in the offices held by Mr. Datlof. He was both president and treasurer of Donchester throughout that firm's entire existence. (Stip. par. 3; Deft. Ex. 1; Tr. 86.)

17. Donchester was originally organized for the purpose of manufacturing textile products for a partnership owned by Bernard and Abraham Stoumen, which traded under the name of Fairplay Knitting Mills and under the name of Brentwood Knitting Mills. (Pltf. Ex. 9.) The relationships between Donchester and Fairplay-Brentwood were spelled out in a written agreement dated October 13, 1945 between those two firms. (Pltf. Ex. 9.) This October 13, 1945 agreement was virtually identical with the proposed 1944 agreement which had been drawn up by Mr. Datlof's lawyer. (Tr. 387; Pltf. Ex. 7.) Under the terms of the agreement of October 13, 1945, Fairplay-Brentwood was to have first call on Donchester's manufacturing facilities. In return, Fairplay-Brentwood agreed to advance Donchester's payrolls and to supply the necessary raw materials and parts for Donchester's operations. (Pltf. Ex. 9, pars. 1-5.)

18. At the trial, Mr. Datlof testified that "There was no limiting date" to the October 13, 1945 agreement between the Stoumens, trading as Fairplay-Brentwood, and himself. (Tr. 79.) In response to a question by the Court, Mr. Datlof testified that Donchester operated under the terms of this agreement "through 1955". (Tr. 85.) He repeated the same testimony again during cross examination, and went on to add that this agreement "Never went out of effect, to my knowledge." (Tr. 393.)

19. However, later in the trial the defendant produced an agreement dated October 13, 1946 between Bernard Stoumen, trading as Fairplay Knitting Mills and Brentwood Knitting Mills, and Joseph Datlof and the Donchester Manufacturing Company. This agreement, by its terms, "terminated" and "cancelled" the agreement of October 13, 1945. (Deft. Ex. 17.) Mr. Datlof was of the opinion that the signature on this agreement (Tr. 394-404) was his own. In addition, he recognized and identified Mr. Bernard Stoumen's signature on this document, and the signature of Mr. Samuel Schwartz, which attests to his own signature. (Tr. 397; Deft. Ex. 17.) Later, Mr. Datlof admitted that he had known about the existence of this 1946 agreement prior to the time of trial (Tr. 513), but he stated that "This [Deft. Ex. 17] is not an agreement as far as I am concerned. I think this thing is false." No reason was offered by Mr. Datlof in support of this conclusion. However, Mr. Datlof did admit that he and the Stoumens had signed agreements under which they had severed all business relationships. (Tr. 515-517.)

20. Despite the severance of formal contractual relationships, Fairplay-Brentwood (or Brentwood as it subsequently came to be known) apparently continued to be Donchester's major customer for many years. Generally speaking, Brentwood purchased Donchester's entire output (Tr. 106), although Donchester occasionally produced goods for firms such as the David Crystal Company. (Tr. 107.) In addition, Donchester undertook a substantial Government contract in the year 1951 (Deft. Ex. 1, minutes of special meeting of November 9, 1951), and another Government contract in the year 1953. (Tr. 119.)

21. What Mr. Datlof described as "friction points" between Brentwood and Donchester began to develop in the year 1953 (Tr. 106), after Brentwood refused to purchase a jacket line which had been put into production by Donchester. *Ibid.*

Much more serious trouble developed in October 1954, when the time came to set the prices which Brentwood was to pay to Donchester for the goods in the line of spring samples which Mr. Datlof had developed. (Tr. 113.) Mr. Datlof had worked out his price estimates on this line of goods (Tr. 113) in terms of his overhead and direct labor costs (Tr. 114), and he believed that he would lose money if he sold Donchester's production at the prices which Brentwood was willing to pay. (Tr. 118, 252.) Apparently, however, Mr. Datlof was reassured by what he described as an oral promise by Brentwood to bring Donchester back to its financial condition as of October 1954, in the event that Donchester lost money on its spring line of goods. (Tr. 114–116.) In the clothing industry, the "spring" season runs from January through June or July (depending on the weather), and the "fall" season runs from July or August through the end of the year. (Tr. 296.)

22. By January 1955, Mr. Datlof's fears about losing money on the Brentwood spring line began to be realized. (Tr. 233–234.) It then became clear to Mr. Datlof that Donchester would either have to find other customers or go out of business. (Tr. 234.) Hence, by January 1955, he was actively soliciting future business from firms other than Brentwood. (Tr. 236.)

23. At some time shortly after the events described above, Mr. Datlof determined that Donchester would not do any further work for Brentwood after completion of work on Brentwood's spring line. Accordingly, Mr. Datlof made the following report at the Annual Meeting of Donchester's Board of Directors which was held on February 21, 1955 (Deft. Ex. 1):

Mr. Datlof stated that the company was in a precarious financial condition due not only to general business conditions which he said accounted for about 25% but to some special conditions which he did not elaborate with the Brentwood Sportswear. He said he had records to show that if the special conditions with Brentwood had not occurred the company would still be in fairly good operating condition and show some profits. *He stated that they were not continuing to do any work for Brentwood after this spring* and that they had some contracts with Manhattan Shirt, Cluett, Peabody & Co. and McGregor Sportswear. He felt that the amount of business they would get from these companies by fall should keep them running 100% capacity and if they did, the company would operate profitably. (Emphasis added.)

24. Thus, starting in early 1955, Mr. Datlof set out to solicit business from firms other than Brentwood to occupy 100% of Donchester's production facilities. (Tr. 253.) Production of Brentwood's spring line (as established under the October 1954 arrangements) was completed. The last shipment to Brentwood was made about June 15, 1955. (Tr. 122.) Meanwhile, Mr. Datlof had succeeded in obtaining business from a number of other firms. Consequently, at the meeting of Donchester's Board of Directors on May 4, 1955, Mr. Datlof was able to present the following report (Deft. Ex. 1):

Mr. Datlof reported that the Company was short of cash and might need cash to carry the payroll over the next few months.

He also reported that the business which they expected from the concerns mentioned in the minutes of the February Meeting had materialized, and in addition they had obtained business from other concerns and were now doing work for the following Companies:

Cluett & Peabody
Manhattan Shirt Company
McGregor Sportswear Company
A. Berlin and Sons
Banner Pants Company
William Schwartz & Company
Korday Sportswear.

25. Early in 1955, Donchester began to face substantial financial difficulties. In February and March 1955, the firm began to fall behind on bills to suppliers.

(Tr. 443.) In addition, Donchester failed to pay over to the Federal Government the withholding and employment taxes which that firm had collected from the wages of its employees during the first quarter of the calendar year 1955. (Pltf. Ex. 17.) However, subsequent payments by Donchester eventually succeeded in discharging the withholding and employment tax liabilities for that quarter. (Stip. Ex. A, p. 1.) Hence, that quarter is no longer in issue in this case.

26. By June of 1955, it became necessary for Donchester to obtain a $25,000 loan with its landlord, Mr. Morris Kardon. (Tr. 125–126.) This loan was secured by a chattel mortgage covering much of the machinery of the Donchester Manufacturing Company. (Tr. 125.)

27. At the trial, Mr. Datlof indicated that he used the proceeds of the Kardon loan to pay a "net payroll" in the amount of $11,000, and a "vacation payroll" in the amount of $12,000. He indicated that he used the remaining $1,000 to pay state taxes. (Tr. 127.) The following colloquy then ensued between the Court and Mr. Datlof (Tr. 127–128):

> THE COURT: Wait a minute. You paid the state the taxes due the state, but you did not pay the federal; is that it? You took the $25,000 and used most of it for the payroll, about $24,-000 of it?
>
> THE WITNESS: That's right.
>
> THE COURT: And then there was another $1,000 which you paid for state tax, and that you paid, but the federal taxes you did not pay; is that right?
>
> THE WITNESS: Well, apparently, that is right. I never checked these things. Sklar [the firm's independent auditor] used to come to me with these tax records, give me the papers to sign and the checks to sign, and I signed the checks, and I signed the papers, and that was all.

28. Mr. Sklar, mentioned by Mr. Datlof in the passage quoted above, is a certified public accountant with the firm of Sklar, Carmosin & Company. (Tr. 519–520.) He visited Donchester once a month for audit purposes (Tr. 525), and prepared Donchester's tax returns for signature by Mr. Datlof. (Tr. 128; Deft. Ex. 5, 6.) In addition to Donchester, Mr. Sklar's firm performed accounting services for Brentwood (Tr. 525–526), and for "many" other firms. (Tr. 526.)

29. At about the same time that the Kardon loan was negotiated, Mr. Datlof set out to sue Brentwood for approximately $60,000, for losses allegedly sustained in 1953, 1954, and 1955. (Pltf. Ex. 15.) A special meeting of Donchester's Board of Directors was called by Mr. Datlof on July 18, 1955 to authorize Mr. Datlof to make these claims against Brentwood. (Deft. Ex. 1.) This authorization was granted, and Mr. Datlof therefore sent a letter to Brentwood on July 18, 1955, demanding the sum of $59,634.52. (Pltf. Ex. 15, p. 3.) Brentwood failed to respond, and, accordingly, Mr. Datlof retained counsel to prosecute a suit in the Pennsylvania State courts against Brentwood. (Tr. 126, 133, 140.) Mr. Datlof testified (Tr. 172) that "there was over $100,000 in that claim", and that he would have used the proceeds of that suit to pay his taxes and his creditors. *Ibid.*

30. However, Donchester's suit against Brentwood was "continued" (Tr. 140, 144), or "stymied" as Mr. Datlof put it. (Tr. 171.) In addition, as Mr. Datlof indicated at the trial of this case (Tr. 140), "there had been a question on the Agreement". By that, Mr. Datlof apparently meant that the arbitration clause contained in paragraph 7 of the October 13, 1945 agreement marked as Plaintiff's Exhibit 9 in this case, was called into question as a result of the execution of the October 16, 1946 agreement which is marked as Defendant's Exhibit 17 in this case. As Mr. Datlof indicated in his testimony (Tr. 126), Donchester's suit was based on the arbitration clause of the "Agreement" with Brentwood. In any event, the suit against Brentwood was eventually settled (Tr. 512). The proceeds of that suit, in the amount of $2,482.75, have been used

by the defendant to reduce the amount of the outstanding Section 6672 penalty assessment against Mr. Datlof. See Table 2, above.

31. Simultaneously with the events just described, Mr. Datlof contacted Mr. Joseph C. Martucci, an Internal Revenue Service Collection Officer (Pltf. Ex. 17), to discuss Donchester's unpaid withholding and employment tax liabilities. (Tr. 404–405.) Mr. Datlof variously described the time of his first meeting with Mr. Martucci as "the latter part of July" (Tr. 405), the "first part of August" (Tr. 405), "the end of July of '55" (Tr. 495), or "in the middle of July" (Tr. 130). Mr. Datlof described his first meeting with Mr. Martucci in the following way. (Tr. 404–405.)

I called up and I talked to somebody there and *I said that I knew that we were behind. We had never been behind before.* [Emphasis added.]

Despite Mr. Datloff's statement that he not only knew of Donchester's tax delinquencies, but knew that Donchester had never been behind before, he nevertheless testified at the trial that "I never looked at these things [taxes]" (Tr. 130), that he "wasn't aware of" the tax situation of Donchester prior to the July meeting with Mr. Martucci (Tr. 495), and that he "was in the factory all of the time" and was consequently not in a position to be aware of tax liabilities. (Tr. 130, 407.)

32. In any event, it is clear that in July or early August of 1955, Mr. Datlof rapidly became aware of Donchester's tax delinquencies. As is indicated by plaintiff's Exhibit 17, Mr. Martucci of the Internal Revenue Service initially contacted Mr. Datlof regarding Donchester's tax delinquencies for the first quarter of 1955 only. As of the beginning of July 1955, Donchester's only delinquency related to the first quarter of the year 1955, since the payment for the second quarter was not yet overdue. Of course, at a later date, additional quarterly payments became delinquent. As is indicated by Table 1, above, Donchester's tax liabilities for the first quarter of 1955 were eventually paid. (See Tr. 145.) Hence, the only quarters at issue in this case are the remaining three quarters of the year 1955.

33. Mr. Datlof described the events at his initial July 1955 meeting with Mr. Martucci in the following way (Tr. 495):

A. Well, we [Mr. Datlof and Donchester's Attorney] went over this with Mr. Martucci, and I explained to him that—I told him exactly what had happened. As a matter of fact, I think I wrote him a letter on it. I told him what —I said what our situation was and why we were in this position that this essentially has been because of the Brentwood lack of payment.

Q. And after that meeting, were there any taxes paid by Donchester, withholding and FICA?

A. Yes. We paid—well, there was one check for over $7,000.

34. At an earlier point in the trial, Mr. Datlof gave a slightly different version of events at a meeting with Mr. Martucci, and indicated that the meeting in question took place in August 1955. (Tr. 145.) That testimony does not indicate that Mr. Caldwell was present. In addition, that testimony makes it clear that Donchester's tax delinquencies for more than one quarter were discussed with Mr. Martucci by Mr. Datlof. Hence, that testimony probably relates to a *second* meeting between Mr. Datlof and Mr. Martucci, at which Donchester's tax delinquencies for the first two quarters of 1955 were discussed. Note, in this connection, the testimony at Tr. 169–170 regarding Mr. Datlof's later meetings with Mr. Martucci.

35. As Mr. Datlof pointed out in the passage just quoted, he "wrote a letter" to the Internal Revenue Service regarding Donchester's unpaid taxes. As a matter of fact, Mr. Datlof wrote quite a number of letters on this subject. On September 22, 1955, he wrote to Mr. Martucci to confirm the promise he had made to Mr. Martucci (during a conversation

on September 21, 1955) to pay the first quarter's delinquent taxes by September 30, 1955. (Deft. Ex. 2.) He wrote the District Director of Internal Revenue on September 28, 1955. (Pltf. Ex. 20.) On December 2, 1955, Mr. Datlof sent a letter to Mr. Martucci (which was signed under his authority by his bookkeeper-secretary, Miss Doris Shaftman). (Deft. Ex. 3; Tr. 163, 164–166, 201–205.) He wrote to Mr. Martucci again on December 7, 1955, to plead for more time "to liquidate the current delinquency". (Deft. Ex. 4, p. 2; Tr. 498.) In addition, Mr. Datlof wrote to Donchester's attorney, Mr. Caldwell, on December 6, and December 23, 1955, enclosing checks for "withholding taxes". (Pltf. Ex. 2, 3.) Mr. Datlof also "took to Mr. Martucci" a letter dated November 16, 1955 from one of Donchester's customers, in an attempt to prove that Donchester "would be running at full blast" and "would be in good shape". (Tr. 149–150; Pltf. Ex. 16.)

36. In addition, Mr. Datlof supplied the Internal Revenue Service with a copy of the chattel mortgage which he had given to Mr. Kardon. (Tr. 625, 499.) Mr. Datlof also stated that "I kept them [the I.R.S.] abreast of the situation right along, all of the way down." (Tr. 170.) And when Donchester finally did go down, Mr. Datlof "went to the Internal Revenue Bureau" and "sat down * * * and explained * * * exactly what the situation was". (Tr. 176.)

37. Mr. Datlof made it very clear at the trial what it was that he wanted as a result of these extended negotiations with the Internal Revenue Service. (Tr. 152–153.)

I was more concerned at that time with the entire picture. Help was very scarce to get, and if people got the idea that the company was in bad shape we would wind up looking at an empty factory, which is not a very good thing. So we had to also keep all this—we had to keep everything as settled as possible.

\* \* \* \* \* \*

All they had to do was to get a Government man to walk in and just show himself there, and I would have trouble, so I went to Martucci with that in mind. I explained it to him that way, that if we were to operate, if we were to be able to do anything with this we have got to keep the thing running at a level, and he agreed to it, and so we proceeded to operate.

38. Meanwhile, in "June or July" of 1955 (Tr. 469), Mr. Datlof was contacted by Mr. Fred Isaacson who was the head of a New York boyswear firm which was known at that time as L. Isaacson and Company. (Tr. 469.) That firm is now known as Donmoor-Isaacson. (Tr. 535.) Mr. Datlof recognized that "Donmoor", as the firm is commonly known (Tr. 145), was "what we needed to replace Brentwood". (Tr. 470.) Of course, as was outlined above, Donchester had ceased to accept any more business from Brentwood. But, as Mr. Datlof pointed out at the trial, the firms such as Cluett and Peabody and Manhattan Shirt, and the others which Donchester solicited in the year 1955, "never really amounted to any big bulk of goods." (Tr. 305.) Consequently (Tr. 305):

That is the reason why, when Donmoor came along and said they could use that amount of goods, we grabbed them with open arms. They were somebody that we were tied to, and we had production there. The others were pretty much in and out.

39. Donmoor dealt with Donchester through the Peay Manufacturing Corporation, which was a Pennsylvania corporation organized by Donmoor in June or July, 1955. (Tr. 537, 539.) The president of Peay was Mr. Richard Frankfort (Tr. 539.) Mr. Frankfort is Mr. Fred Isaacson's son-in-law (Tr. 146, 611), and this led Mr. Isaacson to take an additional interest in the affairs of Peay, over and above the normal business interest which he had in a firm which was the sole source of supply of goods for one of his companies. (Tr. 611.)

40. As originally organized, the purpose of the Peay Manufacturing Company was to act as an intermediary in connection with "contract arrangements" between Donmoor-Isaacson, on the one hand, and Donchester Manufacturing Company, on the other. (Tr. 554–555.) As originally organized, Peay did not have any manufacturing facilities of its own. (Tr. 557.) Peay depended entirely upon Donchester, its sole supplier, to produce the goods which Peay then sold to Donmoor. Ibid.

41. At the trial, Mr. Datlof testified that, in July 1955 (Tr. 146), he explained to Mr. Isaacson what Donchester's tax and financial situation was. (Tr. 147.) Mr. Datlof's testimony on this subject is as follows (Tr. 147):

> Now, I explained to Isaacson exactly what our position was at the time, and he gave me a letter—
>
> Q. You informed him about the tax situation?
>
> A. Yes. *I told him about the tax situation.* I told him we owed the landlord $25,000. I told him our financial picture wasn't very good. (Emphasis added.)

However, Mr. Isaacson testified as follows (Tr. 562):

> As I recall, we had discussions with Mr. Datlof regarding the situation. He made known to us that he owed rent, he owed payments on the chattel mortgage. *He never made us aware of the fact that he owed considerable sums for withholding taxes.* (Emphasis added.)

42. Meanwhile, from July 1955 onward, Donchester was financing its operations, at least in part, out of the proceeds of advances made by the firms, such as McGregor, for which Donchester was producing goods. (Tr. 618–619.) Similarly, the Peay Manufacturing Company was called upon to make advances to Donchester, and did so. (Tr. 629–630.) In addition, Donmoor, Peay's corporate parent, advanced some of the payroll money needed by Donchester. (Tr. 170, 560–561.) As a consequence, the Isaacson firms, and especially Peay, lost heavily when Donchester failed. (Tr. 609, 590–591.)

43. In order to deal with Donchester's tax problems, Mr. Datlof called a meeting in August 1955, which was attended by Mr. Schwartz, Donchester's secretary; Mr. Caldwell, Donchester's attorney; Mr. Sklar, Donchester's accountant, and Mr. Datlof. (Tr. 144.) At this meeting, Mr. Datlof stated that "I tried to set up some modus operandi in order to cope with the situation as it was." (Tr. 144–145.) At this meeting, Mr. Datlof presented some figures which apparently related to Donchester's withholding tax liabilities and which had been prepared for Mr. Datlof by Mr. Sklar. (Tr. 411–412.)

44. Subsequently, at a special meeting of Donchester's Board of Directors, held on October 5, 1955, Mr. Datlof reported on the progress of the suit against Brentwood. The minutes of that meeting also indicate that (Deft. Ex. 1)

> Mr. Datlof reported that the Company owes approximately $35,000 to the U. S. Government for withholding taxes which have accrued since January 1, 1955 but was unable to pay the same and continue the operation of the business because of the failure of Brentwood to make the adjustments due under the contract and to advance the payrolls as the contract required. He stated that the payrolls have been averaging between $15,000 and $16,000 per week. He stated further that they had paid the first quarter of these taxes and he had been in touch with Mr. John Martucci, Regional Supervisor, and he had explained the Company's situation to him and was endeavoring to arrange to adjust the matter to prevent a lien from being filed against the Company. He said that Mr. Martucci told him he would investigate the situation and get in touch with Mr. Datlof but so far he has not done so.

The "contract" to which reference is made in the passage just quoted is apparently the Agreement between Don-

chester and Brentwood dated October 13, 1945, under which Brentwood agreed to advance payrolls to Donchester. See paragraph 3 of Plaintiff's Exhibit 7. However, as was pointed out, above, the Agreement of October 16, 1946, which appears in the record as Defendant's Exhibit 17, terminated and cancelled the agreement of October 13, 1945. By February 1955, Mr. Datlof was soliciting business, from firms other than Brentwood, to occupy 100% of Donchester's production facilities (Tr. 253), and the last shipment of goods to Brentwood under the orders placed in October 1954, was made in June of 1955. (Tr. 122.) Hence, the record does not indicate any reason why Brentwood should be advancing money to Donchester in October 1955, especially since Donchester was suing Brentwood at that time. (See Deft. Ex. 1, minutes of meeting of October 5, 1955.)

45. In any event, the most important point about Donchester's October 5, 1955 Board of Director's meeting is that it was at this meeting that Mr. Datlof formally advised Donchester's Board of Directors of that firm's tax delinquencies. The Court takes judicial notice of the fact that October 5, 1955 was a Wednesday. No checks were written on the checking account of Donchester on the following day, October 6, 1955. However, on Friday, October 7, 1955, Mr. Joseph Datlof wrote a series of 46 checks in the total amount of $30,-100.80. (Deft. Ex. 13.) All of these checks were written over Mr. Datlof's signature alone (Deft. Ex. 13), and all were honored by the bank and paid. (Tr. 321, 322.) Each of these checks discharged some obligation of Donchester's other than its federal withholding and employment tax obligations. For example, Check Number 10746, written by Mr. Datlof on October 7, 1955, is Mr. Datlof's paycheck in the amount of $329.-00. (Tr. 419; Ex. 13.) Other checks written on that same date were for payroll, union dues, petty cash, gas, Philadelphia Shirt and Pajama Manufacturer's Association dues, delivery charges,

a subcontractor's payroll (Tr. 422, 436–437), machines, thread, webbing, shape tickets, sewing machine parts, tools, trimmings, help wanted ads, electrical maintenance work, stamp pads, woven labels, shade numbering, oil, polyethylene bags, and paper boxes. (See, generally, Tr. 418–430.) In short, after having announced on October 5, 1955, that Donchester was approximately $35,000 behind on its federal withholding tax payments, Mr. Datlof then proceeded on October 7, 1955, to pay $30,100.80 in Donchester's funds to creditors other than the Federal Government. (Deft. Ex. 1, October 5, 1955 minutes; and Deft. Ex. 13.)

46. Of course, Mr. Datlof testified on two separate occasions that it was not possible for him to sign Donchester's checks alone. According to Mr. Datlof, all checks required two signatures. Thus, on March 1, 1965, at a deposition taken in this case, Mr. Datlof testified as follows (Tr. 464–465):

BY MR. TAYLOR:

Q. In other words, every check called for a double signature?

A. Every check had a double signature.

BY MR. FIELD:

Q. The fact of the matter is you were paid a salary check just like anyone else?

A. Right.

Q. Those salary checks required this double signature?

A. Exactly.

Similarly, at the trial of this case, Mr. Datlof initially testified as follows (Tr. 260–261):

Q. * * * Does that mean that you didn't sign checks alone?

A. I didn't sign checks alone, unless there was an emergency, and then Mr. Schwartz had to countersign it later.

Q. So that the checks always required two signatures; is that right?

A. Until the end.

Q. When was the end?

   &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

Q. Can we now tie it down to December 21, 1955?

A. Yes. And I would like to point something out here. It only went for a period of one week.

47. However, at the trial of this case, a total of 174 checks, bearing Mr. Datlof's signature alone, were introduced into evidence. (Deft. Exs. 11, 12, 13; Pltf. Ex. 24.) A study of these Exhibits indicates that Mr. Datlof disbursed Donchester's funds in the total amount of $108,072.09 between July 14, 1955 and January 3, 1956, by means of checks bearing his signature alone. The computation of the dollar figure specified in the preceding sentence is shown in Table 3, below:

Table 3

Donchester Corporate Funds Disbursed
by Mr. Joseph Datlof in Last Half of
Calendar Year 1955, by Means of Checks
Bearing His Signature Alone

| Exhibit Number | Number of Checks in Exhibit | Inclusive Dates of Checks in Exhibit | Dollar Amount of Checks in Exhibit |
|---|---|---|---|
| Deft. 12 | 3 | July 14, 1955 to September 2, 1955 | $10,892.02 |
| Pltf. 24 | 1 | August 5, 1955 | $10,979.60 |
| Deft. 13 | 142 | August 16, 1955 to November 18, 1955 | $79,772.84 |
| Deft. 11 | 28 | November 18, 1955 to January 3, 1956 | $ 6,427.63 |
| Totals | 174 | | $108,072.09 |

48. All except two of the 174 checks in Defendant's Exhibits 11, 12, and 13, and in Plaintiff's Exhibit 24 were written on or after August 16, 1955, and most of them were written after October 5, 1955. The two exceptions are check number 10427, dated July 14, 1955, which is part of Defendant's Exhibit 12, and check number 10481, dated August 5, 1955, which is Plaintiff's Exhibit 24. As was pointed out earlier, Mr. Datlof discussed Donchester's withholding and employment tax liabilities with Mr. Martucci of the Internal Revenue Service "in the middle of July" (Tr. 130), "the latter part of July" (Tr. 405), or, in any event, not later than the "first part of August." (Tr. 405.) Hence, all of the checks in Defendant's Exhibits 11 and 13 must have been written after Mr. Datlof knew of Donchester's unpaid withholding and employment tax liabilities. In addition, all or most of the checks in Defendant's Exhibit 12 and Plaintiff's Exhibit 24 were probably written after Mr. Datlof had knowledge of Donchester's tax delinquencies.

49. During the fall of 1955, the financial affairs of the Donchester Manufacturing Company went from bad to worse, despite the fact that the Peay Manufacturing Company was now purchasing most of Donchester's production. (Tr. 305.) Donchester's continuing losses were apparently a result of the "piece rates" at Donchester which had been established by Mr. Datlof. (Tr. 583–584.) These piece rates made Donchester "a continuing high cost plant." (Tr. 584.)

50. By October of 1955, Donchester had begun to fall behind on its payments in connection with the $25,000 chattel mortgage loan from Mr. Morris Kardon. (Deft. Ex. 1, minutes of meeting of October 5, 1955.) This is the loan which Mr. Kardon had made to Donchester in July 1955, as outlined earlier. In addition, Donchester also owed "a couple months" rent to Mr. Kardon, or to one of Mr. Kardon's companies. (Tr. 475–476, 505.) In December 1955, Mr. Kardon decided to foreclose the chattel mortgage which he had received to secure his $25,000 loan to Donchester in July 1955. (Tr. 476, 559; Deft. Ex. 1, minutes of meeting of December 21, 1955, p. 2.) In addition, Mr. Kardon also moved to assert his rights under Pennsylvania law as an unpaid landlord. (Tr. 476–477, 559.) Mr. Kardon asserted his landlord's rights by levying on all of Donchester's property in the Arch Street premises, other than the property covered by Mr. Kardon's chattel mortgage. The property covered by the mortgage was made the subject of a judgment in replevin in favor of Mr. Kardon. (Deft. Ex. 1, minutes of meeting of December 21, 1955, p. 2.)

51. On or about December 28, 1955, Mr. Kardon leased the former Donchester premises to the Peay Manufacturing Company. (Tr. 599–600.) The machinery and similar property on those premises was sold to Peay by Mr. Kardon, who gave Peay a bill of sale for that property. (Tr. 569, 602.) In return, Peay paid Kardon the remaining amount owed to Mr. Kardon under the terms of his July 1955 note from Donchester. (Tr. 601–602.) In addition, Peay paid Mr. Kardon Donchester's back rent. *Ibid.* In this way, Mr. Kardon was repaid the full amount of his July 1955 loan to Donchester. In addition, Mr. Kardon received all of his rent payments, and acquired a new and solvent tenant in Donchester's Arch Street premises.

52. The trial testimony contains sharply conflicting testimony as to the identity of the person who originated the idea for the transaction just described. Mr. Isaacson of the Peay Manu-facturing Company testified as follows (Tr. 563):

As I recall, we had discussions with Mr. Datlof regarding the situation. He made known to us that he owed rent, he owed payments on the chattel mortgage. He never made us aware of the fact that that he owed considerable sums for withholding taxes. *He suggested that what would occur would be that the landlord would take over the premises for lack of payment and that the chattel mortgage people,* whoever they were—I don't recall who they were —*would also exercise their rights, and that if Peay would buy from those who held the various rights* to the chattel mortgage, and get together with the landlord on the question of the rental that was owing by Donchester Manufacturing Company, *that he would continue as manager for us.* (Emphasis added.)

Mr. Isaacson also testified that he regarded Mr. Datlof as a "competent manager" who "had gotten himself into difficulties" and that, as a consequence, he wanted Datlof to continue as manager at the Arch Street premises. (Tr. 564.) In addition, Peay had never expected that it would actually have to operate a manufacturing enterprise (Tr. 557), and, as a consequence, it needed an experienced factory manager such as Mr. Datlof. (Tr. 573, 577–578.) Finally, Mr. Isaacson testified that the foreclosure and sale plan had been discussed with Mr. Datlof (Tr. 573) and that, at a meeting with Mr. Kardon to discuss this plan, Mr. Datlof raised no objections to the foreclosure and sale procedure. (Tr. 567.)

53. Donchester's minute book corroborates Mr. Isaacson's testimony, as set forth above. On page 1 of the minutes of the special meeting of Donchester's directors on January 11, 1956, the following appears. (Deft. Ex. 1.)

On December 19, Datlof called Peay on the 'phone and told them Kardon was going to foreclose and to come over and get in touch with Kardon to see what could be done. He told them he would

run the factory for them if they bought the plant in order to protect the customers and get them out whole, and he only wanted a salary of $10,000 a year, for two years, * * *.

The minutes quoted above were signed by Wesley Caldwell, Esquire, Donchester's attorney, who functioned as acting secretary at the January 11, 1956 meeting. Mr. Schwartz attended this meeting, but did not act as secretary. (Deft. Ex. 1, minutes of January 11, 1956 meeting.)

54. Nevertheless, Mr. Datlof testified that he did not suggest the Kardon takeover to Mr. Isaacson. His testimony on this subject is as follows (Tr. 477):

Q. Had you suggested to Mr. Isaacson that he go to Mr. Kardon and request this foreclosure?

A. No.

Q. Had you suggested to Mr. Isaacson that he buy Kardon's rights as landlord and chattel mortgagee?

A. No.

55. In any event, it is clear that the scheme of foreclosure and sale outlined above was, in fact, executed. It is equally clear that this plan had distinct advantages for everyone except Brentwood, the Federal Government, and Donchester's unsecured creditors. The advantage to Mr. Kardon was the repayment of his July loan to Donchester, the payment of his back rent, and the acquisition of a solvent tenant. The advantage to Peay was assurance that its work in process on the Donchester premises would be completed. (Tr. 560–561.) The advantage to Mr. Datlof was a new job at $10,000 per year.

56. Of course, Donchester's stock could and did become worthless as a result of the foreclosure and sale described above, but most of that stock was held by Brentwood, and Mr. Datlof had burned all his bridges with Brentwood when he brought suit against that firm in July 1955. (Deft. Ex. 1, minutes of meeting of July 18, 1955.) In addition, of course, Mr. Datlof's stock in Donchester would also become worthless, but the outstanding federal withholding tax liabilities of Donchester were so large in December 1955 (Stip. Ex. A) that it must have been clear to Mr. Datlof that this stock was virtually worthless anyway.

57. However, the plan of foreclosure and sale outlined above did not work out precisely as expected. What did occur was described by Mr. Isaacson in the following way. (Tr. 569–570.)

MR. FIELD: * * * What was then done?

WITNESS ISAACSON: Peay attempted to carry on the operation of the factory.

MR. FIELD: Who would have been in charge of the operation at the time?

WITNESS ISAACSON: Mr. Frankfort. Mr. Datlof was supposed to have taken that, because Mr. Frankfort had no experience in that area.

MR. FIELD: What happened, sir?

WITNESS ISAACSON: Immediately after the purchase and when Mr. Datlof was advised that it was purchased, he became another person. That's the only thing I can say.

MR. FIELD: What happened, sir. Tell us what the fact is, as you observed it.

WITNESS ISAACSON: He just got up and walked out, and said he would have no part of it, it wasn't any part of his—he wasn't going to do it, and from then on we just had a series of—what shall I say—efforts made by Mr. Datlof to destroy the operation if he possibly could.

In this way, the Donchester Manufacturing Company came to an end.

MR. JOSEPH DATLOF'S POWERS AND DUTIES AS DONCHESTER'S PRESIDENT AND TREASURER

58. The agreement between the incorporators of the Donchester Manufacturing Company (Pltf. Ex. 8) provides as follows (par. 11):

Datlof shall give his entire time and attention solely to the corporate business and perform such duties as the

parties hereto may agree, * * *. Stoumen and Schwartz shall only be obliged to devote such time and attention to the corporate business as they deem advisable * * *.

Thus, under the terms of this agreement, Mr. Datlof was the *only* full time officer of the Donchester Manufacturing Company. As the trial transcript indicates, Mr. Datlof was fully aware of this provision of the incorporator's agreement. (Tr. 457–458.) In addition, the trial transcript makes it clear that Mr. Datlof remained Donchester's only full time officer throughout Donchester's entire existence. Thus, for example, Mr. Datlof's bookkeeper-secretary, Miss Doris Shaftman, testified that Mr. Datlof was the corporate officer who was normally on Donchester's premises. (Tr. 51–52.) Similarly, Donchester's independent auditor, Mr. Irvin Sklar, testified, when asked to name "the full-time officers" of the Donchester Manufacturing Company, that "Joseph Datlof was the full-time officer." (Tr. 520.)

59. The testimony of Mr. Frankfort and Mr. Isaacson is to the same effect. (Tr. 592–593.)

MR. FIELD: During the period, sir, when Donchester was working on Peay's goods, and I am referring now to the period from approximately mid-1955 to late November-December 1955, during that period with whom did you deal, Mr. Isaacson, when you dealt with Donchester Manufacturing Company?

WITNESS ISAACSON: With Mr. Datlof.

MR. FIELD: Do you recall dealing with anyone besides Mr. Datlof?

WITNESS ISAACSON: There were people who would come into the plant, but we only dealt with Mr. Datlof.

MR. FIELD: Why was that, sir?

WITNESS ISAACSON: He was always on the premises, he was the person in charge, the person with whom all arrangements were made.

MR. FIELD: Mr. Frankfort, did you have any dealings with Donchester Manufacturing Company during the period from approximately mid-1955 until this November-December trouble period?

WITNESS FRANKFORT: Yes, certainly.

MR. FIELD: With whom did you deal when you dealt with Donchester?

WITNESS FRANKFORT: With Mr. Datlof.

MR. FIELD: Why did you deal with him, sir?

WITNESS FRANKFORT: For the same reasons. To the best of my knowledge, he was Donchester.

60. The testimony of the witnesses quoted above is further corroborated by a reading of the By-Laws of the Donchester Manufacturing Company, which are part of Defendant's Exhibit 1. Under the terms of those By-Laws, Mr. Datlof, as president of Donchester, had "general and active management of the business of the Corporation". See Article 28 of the By-Laws. In addition, as treasurer, Mr. Datlof was empowered to keep the books of the corporation, and to collect, deposit, and disburse its funds. See Articles 34 and 35 of the By-Laws.

61. As outlined earlier, Mr. Datlof disbursed at least $108,072.09 from Donchester's funds during the last half of the year 1955, by means of checks bearing his signature alone. The trial transcript makes it clear that Mr. Datlof had the power to write such checks, that the checks were honored, and that the Broad Street Trust Company would never have honored such a large number of checks if Mr. Datlof did not have such power. (Tr. 365, note also, Tr. 318–319, 321–322, 334–337, 338, 350, and 364.)

62. Mr. Datlof testified at the trial that he did not have any contact with the Broad Street Trust Company regarding loans. (Tr. 120, 214–215.) However, the evidence is to the contrary. See, for example, Defendant's Exhibit 7, which is an $18,000 note dated September 12, 1955, signed in two places by Mr. Datlof. Mr.

Datlof admitted that he signed this note (Tr. 216), and that he went down to the bank in connection with that note when the bank called him. (Tr. 217.) In addition, Defendant's Exhibit 14, which is entitled "CERTIFIED COPY OF LOAN RESOLUTION", dated November 19, 1951, empowered Joseph Datlof "to borrow money from the BROAD STREET TRUST COMPANY". Thus, Mr. Datlof had the power to borrow money from the Broad Street Trust Company on behalf of Donchester (Deft. Ex. 14), and he made use of that power. (Deft. Ex. 7.)

63. Since Mr. Datlof was the only full time officer of Donchester, he was the only officer who drew a salary from that firm. (Tr. 450–451.) Mr. Schwartz drew expense money from Donchester, and was allowed to drive the company car, but Schwartz did not draw any salary. (Tr. 451.) Mr. Datlof testified under oath on March 1, 1955, that he cut his salary in the year 1955 by "fifty percent". (Tr. 453–454.) However, examination of Donchester's tax returns (Deft. Exs. 5, 6) indicates that Mr. Datlof's salary from Donchester actually increased from $17,-900.00 in the year 1954 to $18,200.00 in the year 1955. See Schedule E—Compensation of Officers—in Defendant's Exhibits 5 and 6, respectively.

64. Defendant's Exhibits 5 and 6, which are Donchester's Federal Corporate Income Tax Returns, Forms 1120, for the years 1954 and 1955, respectively, are both signed by Mr. Joseph Datlof. Similarly, examination of Plaintiff's Exhibits 10, 11, and 12, which are Donchester's Forms 941, Employer's Quarterly Federal Tax Return, for the first three quarters of 1955, respectively, indicates that those forms were prepared for Mr. Datlof's signature as "Pres." See the space after item 9 on those forms. In addition, the trial transcript indicates that the Forms 941 were prepared for Mr. Datlof's signature by his bookkeeper-secretary, Miss Shaftman, in the normal course of business, and that those forms were, in fact, submitted to Mr. Datlof for signature. (Tr. 445–446.) In addition, Miss Shaftman testified that, in the normal course of business, Donchester's Pennsylvania state tax returns, and Philadelphia city tax returns were prepared by her and submitted to Mr. Datlof for signature. (Tr. 50–51.)

65. Donchester's other financial records were also prepared for examination by Mr. Datlof. Thus, for example, Donchester's independent auditor, Mr. Irvin Sklar, submitted "tax records" to Mr. Datlof. (Tr. 128.) Similarly, it was Mr. Datlof with whom Mr. Sklar reviewed Donchester's withholding tax situation in the year 1955 (Tr. 131), and it was Mr. Datlof who presented Sklar's figures to Donchester's Board of Directors during the 1955 meeting of the Board which discussed Donchester's withholding tax liabilities. (Tr. 411–412.) Similarly, Miss Doris Shaftman, Donchester's bookkeeper-secretary, ran cost analyses of payroll costs for submission to Mr. Datlof. (Tr. 47.)

66. Within Donchester, withholding tax matters were handled by the payroll department, which was supervised by Miss Shaftman. (Tr. 31, 49.) In addition, Miss Shaftman also had charge of Donchester's accounts. (Tr. 264.) Miss Shaftman's desk was located immediately outside Mr. Datlof's office (Tr. 46), and there was no one located closer to Mr. Datlof than herself. *Ibid.* Miss Shaftman regarded Mr. Datlof as her boss (Tr. 45) and Mr. Datlof testified that Miss Shaftman worked under his supervision. (Tr. 166.) As a result of the working relationships just described, Miss Shaftman went to Mr. Datlof for advice when she discovered that Donchester had failed to pay its federal withholding taxes. (Tr. 132.) Mr. Datlof advised her to contact Mr. Sklar and Mr. Schwartz (Tr. 52), and she did so in obedience to his directions. (Tr. 53–54.)

67. Miss Shaftman also testified that she consulted Mr. Datlof about overdue invoices. (Tr. 48.) This conflicts with Mr. Datlof's testimony that "I never looked at invoices * * *." (Tr. 303.) Later, the Court questioned Mr. Datlof about his right to refuse to pay such invoices if he so chose. (Tr. 438–440.) Mr.

Datlof indicated that he always assumed that if a check in payment of an invoice was given to him, it was "all right". (Tr. 440.) However, this testimony, in response to questions by the Court, conflicts with Mr. Datlof's own earlier testimony about his refusal to pay a bill for $907.99 for pocket lining (Tr. 434), and with his later acknowledgement of his power to refuse to pay bills if he felt it was improper to do so. (Tr. 442, 488.)

68. Mr. Datlof opened Donchester's bank account at the Broad Street Trust Company in 1945 (Tr. 210, 214), pursuant to the resolution of Donchester's Board of Directors on November 9, 1945. (Deft. Ex. 1, minutes of meeting of November 9, 1945, p. 2.) Similarly, when Donchester went out of existence, Mr. Datlof withdrew the remaining sums in the firm's bank account, and turned that money over to Donchester's attorney. (Tr. 634–635.)

69. It was also Mr. Datlof who established the prices at which Donchester sold its products. (Tr. 302–303, 113, 114, 118, 252, 471, 520–521, 583, 594.) As Mr. Datlof described it, the first step in price setting was to determine the "component operations" needed to produce a particular garment. A "piece rate" was then set with the union for each operation, "findings" were taken into account, and an "overhead factor" was applied, together with a "profit factor". The result was Donchester's price. (Tr. 302–303.) As has been indicated earlier, Mr. Isaacson is of the opinion that Mr. Datlof set "piece rates" too high, and that this was the principal reason for Donchester's financial difficulties. (Tr. 583–584.)

70. Mr. Datlof was also in charge of hiring and firing at Donchester. For example, it was Mr. Datlof who hired Miss Shaftman (Tr. 23), and who established what her pay was to be. (Tr. 46.) In addition, Mr. Datlof hired, trained, and supervised all of Donchester's foremen. (Tr. 462–463.) The foremen, in turn, determined which of the subordinate employees would be hired and fired. (Tr. 462.) Finally, when in the year 1953 Mr. Bernard Stoumen of Brentwood induced Mr. Datlof to place Stoumen's son-in-law on Donchester's payroll (Tr. 109, 112), Mr. Datlof "threw him [the son-in-law] out", despite the fact that this step was not calculated to please Mr. Stoumen. (Tr. 113.)

71. In addition to all of his other activities, Mr. Datlof also found time to represent Donchester at trade association meetings (Tr. 459,), to arrange for Donchester's insurance (Tr. 458–459), to conduct negotiations with the two unions at Donchester's plant (Tr. 460–461), and to negotiate subcontracts with other firms (such as the Berkey Corporation) which produced some of the garments which Donchester then resold to others. (Tr. 436–437.)

72. Despite all the evidence of financial control summarized above, Mr. Datlof sought at the trial to portray Mr. Irvin Sklar of Sklar, Carmosin & Company as the person who was really in control of Donchester's finances. Thus, for example, Mr. Datlof testified that Mr. Sklar promised Mr. Datlof at "sometime between the 15th and the 25th" of July, 1955, that Mr. Bernard Stoumen would pay Donchester's taxes. (Tr. 132.) Mr. Sklar's reply to this was as follows. (Tr. 521.)

Q. Did you promise Mr. Datlof or anyone else at Donchester that you or Brentwood Sportswear or anyone with Brentwood Sportswear would pay the 1955 withholding and Federal Insurance Contribution Act taxes of the Donchester Manufacturing Company.

A. Absolutely not.

Similarly, Mr. Datlof testified that he was not in a position to have dismissed Mr. Sklar, even if he had wished to do so. (Tr. 130–131.) Mr. Sklar's testimony on this subject was as follows. (Tr. 520.)

Q. Is there any reason known to you, Mr. Sklar, which would have prevented Mr. Datlof from retaining some accountant other than yourself if he wished Donchester to have a different accountant.

A. No.

Mr. Sklar, although cross examined on other matters, was not even questioned on cross examination about the two matters set forth above.

73. Mr. Datlof admits that he paid other creditors of the Donchester Manufacturing Company after he knew that Donchester was in arrears in its tax payments. His testimony on this subject is as follows. (Tr. 443–444.)

Q. So far as you know, Mr. Datlof, did you pay any creditors of Donchester other than the Federal Government after you knew that the tax liabilities of Donchester were in arrears?

A. You know, that is something. When you say 'you know the thing is in arrears,' sometimes I try to think back. This isn't as cut and dry as owing the light company for last month's light bill.

\* \* \* \* \* \*

So you say did I pay any other creditors? Sure, I must have paid some of the express companies and some of the light companies and that sort of thing. We didn't have any big creditors, proportionally that big. In other words, in our payroll, if it was running $15,000 for that week, if we had $500 to pay out in bills, it was for bills and that's all. We didn't buy any piece goods that big.

Despite Mr. Datlof's attempt to minimize his preferment of other creditors at a time when he knew of Donchester's unpaid tax liabilities, the trial record in this case indicates that he "paid some of the express companies and some of the light companies and that sort of thing" to the extent of $108,072.09, while failing to pay over to the Federal Government the $37,704.10 in withholding and employment taxes which Donchester had collected from the wages of its employees. Compare Table 3, above, with Table 1, above.

74. The evidence produced at the trial of this case therefore indicates with great clarity that it was Mr. Joseph Datlof who was vested with full control over all the activities of the Donchester Manufacturing Company, including its financial affairs and its payment or nonpayment of withholding and employment taxes. The trial record also indicates with great clarity that Mr. Datlof knew of Donchester's unpaid withholding and employment tax liabilities at some time in July, or, at the latest, early August of 1955, but that he nevertheless subsequently paid many of Donchester's other creditors while failing to pay over to the Federal Government the taxes collected from the wages of Donchester's employees.

## DISCUSSION OF FINDINGS OF FACT

Findings of fact proffered by plaintiff are refused insofar as not covered in the foregoing 74 numbered findings.

Plaintiff has submitted written objections to some thirty of the defendant's proposed findings, being those adopted as the findings of this Court and set out heretofore as numbers 19, 23, 24, 27, 28, 32, 41, 44, 45, 46, 47, 48, 49, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 63, 69, 70, 71, 72, 73 and 74. These objections have been carefully considered, and are hereby rejected. It is not possible to consider each of those objections in this discussion, however—although a few comments will be made.

As to No. 19 (by the numbering of this Court's finding, and not that of the submission), plaintiff disagrees with the finding that Mr. Datlof "was of the opinion that the signature on this agreement was his own." That finding cites Tr. 394–404; which testimony I have interpreted in the manner indicated, and I believe the record speaks for itself in support of my finding.

As to No. 23, the objection is that the finding is inaccurate and a conclusion. The challenged finding cites pages of the cross examination of Mr. Datlof, which in turn is based on the deposition of that witness. Insofar as the finding is strict matter of fact, it is supported by the cited record; insofar as it contains matters which might be called conclusory, such conclusions are believed obvious, inescap-

able, and entirely warranted by the testimony.

Most of the other objections are simply matters of interpretation of the testimony. In the Court's view, the testimony and exhibits required those findings, and, therefore, in all respects the plaintiff's objections are overruled.

One remaining matter arises out of matters mentioned in paragraphs 41 and 42 of plaintiff's complaint. At the oral argument on March 8, 1966, the point was raised in the following manner by plaintiff's counsel:

"As to the first quarter ending 3/31 /55 it [Donchester] was able to pay all but $6,039.00 of said taxes, which were paid by it in September of 1955. However, the Government did include this amount in its assessment of the 100% penalty against Datlof. This amount is important as it gives the Court the right to deduct the 2% Employers' share of the FICA taxes for the first quarter of 1955 which the Internal Revenue Service illegally assessed against Datlof. Eventually it abated the said amount, which resulted in that quarter not being involved herein except for its said 2% reduction."

The fact that these payments were made, and the manner in which they were applied are not in controversy. Plaintiff recites them at paragraphs 41 and 42 of his complaint filed July 27, 1962. Document 20 is a stipulation, filed May 12, 1965, which incorporates certain Forms 899 as Exhibit A to that stipulation. Column F of pages 1 and 2 of those forms 899 show the receipt and allocation of the payments made.

■ The only question, therefore, is one of law:—whether a creditor may apply a debtor's payment as he sees fit. Certainly as to a general payment on account, where debtor has made no timely manifestation as to how the remittance is to be applied, the creditor may determine the application to be made. Restatement, Contracts § 387(b) (1932).

■ More specifically, where several debts are owed to the same person, and part payment is made, intent to make appropriation of the payment to any debt must be manifested to the other party by the debtor or creditor. Lincoln Storage Warehouses v. C.I.R., 189 F.2d 337, 28 A.L.R.2d 595 (3rd Cir. 1950).

■ No authority to the contrary has been produced. It is clear from the stipulated facts that the Commissioner manifested his application of the remittance to what was the least secured debt as well as the earliest item of indebtedness. He had a complete right to do so, and plaintiff's objection thereto will be denied.

CONCLUSIONS OF LAW

1. The jurisdiction of this Court is properly founded on the provisions of Section 1346(a) (1) of Title 28 of the United States Code, as amended.

2. Section 3101 of the Internal Revenue Code of 1954 imposes on the income of every individual a tax equal to a specified percentage of the wages received by him, as a contribution to his insurance under the Social Security program, and related programs. Section 3102 of that same Code imposes upon the employer the duty to collect this tax. Section 3402 of the Internal Revenue Code of 1954 provides for the collection of income taxes at their source by requiring every employer to withhold a percentage of the wages which would otherwise be paid to his employees.

3. Under the provisions of Section 7501(a) of the Internal Revenue Code of 1954, the amount of any internal revenue tax collected or withheld from other persons constitutes a special fund in trust for the United States. If a person, as defined in Section 6671(b) of the Internal Revenue Code of 1954, fails to pay over such internal revenue taxes to the United States, that person may be liable under the provisions of Section 6672 of the Internal Revenue Code of 1954, for a penalty equal to the amount of the tax.

■ 4. The penalty imposed by Section 6672 of the Internal Revenue Code of 1954 is an assessment equal to the amount of the tax not paid. Botta v. Scanlon, 314 F.2d 392, 393 (2nd Cir. 1963). Thus,

Section 6672 is used as a tax collection device, rather than as a means of imposing an additional penalty, over and above the amount of the unpaid tax. Cross v. United States, 311 F.2d 90, 94 (4th Cir. 1962); United States v. Molitor, 337 F.2d 917, 920–921 (9th Cir. 1964). Note also, In re Serignese, 214 F.Supp. 917, 919–920 (D.Conn.1963), affirmed sub nom. Goring v. United States, 330 F.2d 960 (2nd Cir. 1964), and Sherwood v. United States, 228 F.Supp. 247 (E.D.N.Y.1964).

■■ 5. In a refund suit such as this, the burden of proof is on the plaintiff. Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385 (1932), Melillo v. United States, 244 F.Supp. 323 (E.D.N.Y.1965). Hence, the burden was on Mr. Datlof to prove that he was not a person who willfully failed in his duty to pay over Donchester's withholding and employment taxes. In addition, the Government's Certificates of Assessments and Payments, Forms 899, which are attached to the Stipulation in this case as Exhibits A, B, and C, are prima facie proof of Mr. Datlof's duty to collect the taxes in question, and of his willful failure to do so. United States v. Galtrof, 245 F.Supp. 158, (S.D.N.Y.1965). Accord, United States v. Strebler, 313 F.2d 402 (8th Cir. 1963); Horwitz v. United States, 339 F.2d 877 (2nd Cir. 1965). Hence, when the stipulation of the parties and the attached Forms 899 were received in evidence (Tr. 374), the burden of going forward upon all elements of the case shifted to Mr. Datlof. Messina v. Scanlon, decided April 14, 1965, 15 A.F.T.R.2d 944 (E.D.N.Y.).

■ 6. As president and treasurer of the Donchester Manufacturing Company, Mr. Joseph Datlof was a "person" within the scope of Section 6671(b) of the Internal Revenue Code of 1954, which specifically states that the word "person" as used in that section "includes an officer or employee of a corporation."

7. Mr. Joseph Datlof was a person who had a duty to truthfully account for and pay over the withholding and employment taxes collected from the wages of the employees of the Donchester Manufacturing Company during the last three quarters of the calendar year 1955, within the scope of Section 6672 of the Internal Revenue Code of 1954. This is indicated by a study of Donchester's corporate By-Laws, by Mr. Datlof's ability to sign checks on Donchester's bank account, by the fact that Mr. Datlof signed all of Donchester's federal, state, and city tax returns, by Mr. Datlof's role in hiring and discharging employees, by his ability to obtain loans for Donchester, and, in general, by Mr. Datlof's control over Donchester's affairs, including its financial affairs. United States v. Strebler, 313 F.2d 402 (8th Cir. 1963); Horwitz v. United States, 339 F.2d 877 (2nd Cir. 1965); Flan v. United States, 326 F.2d 356 (7th Cir. 1964); Dillard v. Patterson, 326 F.2d 302 (5th Cir. 1963); Bloom v. United States, 272 F.2d 215 (9th Cir. 1960), certiorari denied, 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1960).

8. Chief among the criteria which the courts have found useful in determining whether a given individual is a person with a duty to account for and pay over withholding and employment taxes are the following:

a. Contents of the corporate by-laws. United States v. Strebler, 313 F.2d 402, 404 (8th Cir. 1963).

b. The ability of the individual in question to sign checks on the company's bank account. United States v. Strebler, 313 F.2d 402 (8th Cir. 1963); Schweitzer v. United States, 193 F.Supp. 309, 312 (D. Neb. 1961); Melillo v. United States, 244 F.Supp. 323, 326 (E.D.N.Y.1965).

c. The identity of the individual who signed the Employer's Federal Quarterly Tax Return, and the other tax returns of the firm. United States v. Strebler (8a & b supra); Horwitz v. United States, 339 F.2d 877, 878 (2nd Cir. 1965); Schweitzer v. United States, (8b supra).

d. The payment of other creditors instead of the United States. United

States v. Graham, 309 F.2d 210, 212 (9th Cir. 1962); Horwitz v. United States (8c supra); Bloom v. United States, 272 F.2d 215 (9th Cir. 1960); cert. den. 363 U.S. 803, 80 S.Ct. 1236, 4 L.Ed.2d 1146 (1963); Melillo v. United States (8b supra); Tiffany v. United States, 228 F.Supp. 700, 702 (D.N.J. 1963).

e. The identity of the officers, directors, and principal stockholders in the firm. Frazier v. United States, 304 F.2d 528, 529 (5th Cir. 1962); Scherer v. United States, 228 F.Supp. 168, 170 (D.Idaho 1963).

f. The identity of the individuals who hired and discharged employees. Hair v. United States, decided December 10, 1963, 13 A.F.T.R.2d 643 (S.D.Calif.).

g. And in general, the identity of the individual who was in control of the financial affairs of the firm in question. Horwitz v. United States (8 c supra); Flan v. United States, 326 F.2d 356 (7th Cir. 1964); Dillard v. Patterson, 326 F.2d 302 (5th Cir. 1963); Melillo v. United States (8b supra).

9. It is of no importance that Donchester had another officer, in addition to Mr. Datlof, nor is it of any importance that someone else, in addition to Mr. Datlof, might also be liable for the Section 6672 penalty, because more than one person may be liable for the penalty imposed by Section 6672. Spiegel v. United States, (N.D.Ga.1965) 16 A.F. T.R.2d 5667 at 5669; Scott v. United States, (Ct.Cl.1965) 354 F.2d 292. Note also, that Section 6672 specifically refers to "Any person" rather than to "the person".

10. When interpreting the provisions of Section 6672 of the Internal Revenue Code of 1954 in connection with failures to truthfully account for and pay over withholding and employment taxes collected from employees, it is essential to make use of the verb "fails" in order to make sense out of the statute. The word "willfully" modifies the verb "fails" as that verb appears in Section 6672. Hence, the word "willfully" as it initially appears in Section 6672 of the Internal Revenue Code of 1954 must be held to modify not only the phrase "fails to collect such tax" but also the phrase "fails to * * * truthfully account for and pay over such tax." Hence, it is essential to determine whether Mr. Datlof's failure to pay over withholding and employment taxes collected from Donchester's employees was willful.

11. Since Section 6672 is not a criminal statute, the word "willful" is not used in that statute in its criminal sense. In the criminal sense, the word "willful" generally means an act done with a bad purpose. United States v. Murdock, 290 U.S. 389, 394, 54 S.Ct. 223, 78 L.Ed. 381 (1933). However, in civil cases such as the present suit, the word "willful" means intentional, knowing, or voluntary, as distinguished from accidental. Bloom v. United States, 272 F.2d 215, 223 (9th Cir. 1960); Cross v. United States, 311 F.2d 90, 94 (4th Cir. 1962); Dillard v. Patterson, 326 F.2d 302, 304–305 (5th Cir. 1963); Flan v. United States, 326 F.2d 356, 358 (7th Cir. 1964); United States v. Leuschner, 336 F.2d 246, 248 (9th Cir. 1964).

12. In the present case, Mr. Joseph Datlof admits that by "the latter part of July" (Tr. 405), the "first part of August" (Tr. 405), "the end of July of '55" (Tr. 495), or "in the middle of July" (Tr. 130), he met with Mr. Martucci of the Internal Revenue Service to discuss Donchester's withholding and employment tax delinquencies. Hence, from that time forward, Mr. Datlof acted intentionally, knowingly, and voluntarily, i. e. willfully, as he paid out at least $108,-072.09 from Donchester's bank account to creditors other than the United States. In any event, Mr. Datlof admits that he paid creditors other than the United States after he knew of Donchester's tax delinquencies. (Tr. 443–444.) Hence, Mr. Datlof intentionally, knowingly, and voluntarily, i. e. willfully, failed in his

**34**

duty to pay over to the United States the withholding and employment taxes collected from Donchester's employees.

## DISCUSSION

The care, skill and thoroughness with which both counsel have presented the case warrants commendation. The authorities cited and argued by plaintiff have been considered, but are deemed inapplicable in plaintiff's support in view of the findings of fact and conclusions of law heretofore cited. Many of those cases, incidentally, have already been cited in the course of the foregoing conclusions of law.

Plaintiff places great reliance on United States v. Slattery, 224 F.Supp. 214 (E.D.Pa.1963), affirmed 333 F.2d 844 (3rd Cir. 1964). That is a case in which the taxpayer was president of a corporation but was held not responsible for the payment of the kind of taxes in question. The principles applied in that case are no different from those already stated in my conclusions of law, and indeed many of the very cases cited therein have already been noted in the foregoing conclusions of law—numbers 7, 8 and 9 in particular. The fact that the result here is the exact opposite of the result there depends purely and simply upon the difference in the facts found to be present.

In the same way, other cited cases were deemed distinguishable on their facts, i. e. Gibbs, Sr. v. Tomlinson, 64-1 U.S. T.C. 9297; National Bank of Houston, 65-2 U.S.T.C. 9512; Sherwood v. United States, D.C., 246 F.Supp. 502; Tozier v. United States, 65-2 U.S.T.C. 9621; United States v. Graham, 9 Cir., 309 F.2d 210; and Sperry v. Tomlinson, 1 A.F. & R.2d 1810, 58-2 U.S.T.C. 9549.

## CONCLUSION AND ORDER

From the foregoing Findings of Fact, Conclusions of Law, and discussions, it follows that the Plaintiff's claim for refund will be denied, and the counterclaim of the Defendant for the sum of $31,499.45 will be granted, and it is so ordered.