**In re Janice T. BOURQUE, Debtor.**

**Bankruptcy No. 91–10570–JNG.**

United States Bankruptcy Court,
D. Massachusetts.

April 12, 1993.

Joseph I. Schindler, Boston, MA, for debtor.

Charles J. Cannon, Eugene J. Rossi, Trial Attys. for Tax Div., Washington, DC, for U.S. Dept. of Justice, I.R.S.

### MEMORANDUM

JAMES A. GOODMAN, Chief Judge.

## I. INTRODUCTION

The matter before the Court is the objection to the claim of the Internal Revenue Service (the "IRS") filed by Janice T. Bourque ("Bourque" or the "Debtor"). The Court conducted an evidentiary hearing with respect to the Debtor's objection on December 4, 1992. The parties submitted a Joint Pre–Trial Statement prior to the hearing, as well as post-trial memoranda 60 days after the hearing.

The issue before the Court is whether the Debtor's objection to the claim of the IRS should be sustained. The Debtor disputes the basis of the IRS claim, which is that she was a responsible person within the meaning of section 6672 of the Internal Revenue Code during the second, third, and fourth quarters of 1988 and, therefore, liable for the nonpayment of trust fund taxes owed by her employer, COPYQUIK, INC., for those three quarters of 1988. Resolution of the issue has an important consequence: if the Debtor's objection is overruled, she will be ineligible for Chapter 13 relief because the IRS' claim, whether secured or unsecured, exceeds the statutorily imposed debt ceilings for Chapter 13 relief.

*See* 11 U.S.C. § 109(e).[1]

## II. FACTS

The Court makes the following findings of facts based upon the agreed facts set forth in the Pre–Trial Statement of the parties, as well as the trial testimony of Bourque, the deposition testimony of Robert Berardino ("Berardino"), the admissibility of which was the subject of a stipulation, and the exhibits admitted into evidence.

The Debtor filed a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on January 24, 1991. She listed the IRS as a creditor with a disputed claim of $364,414.20. The IRS filed a proof of claim dated June 7, 1991 in the amount of $390,046.41. It later filed an amended proof of claim dated October 19, 1991 in the amount of $384,613.41. Although the claim purported to be secured, at least in part, the IRS conceded at trial that it was unaware of any assets belonging to the Debtor that would secure its tax lien and would proceed on the basis that its claim is unsecured.

The Debtor testified that she was solely responsible for the support of her daughter and that her daughter is a special needs child with cerebral palsy. She indicated that she was awarded a Masters Degree in Business Administration by the University of New Hampshire in May of 1984. Her areas of concentration were finance and accounting. Following graduation from the University of New Hampshire, the Debtor was employed from August 1984 until August 1986 as a staff accountant and auditor by the accounting firm of Coopers & Lybrand. During the period of her employment with Coopers & Lybrand, the Debtor participated in audits of COPYQUIK, INC. ("COPYQUIK"), a corporation organized under the laws of the Commonwealth of Massachusetts on December 6,

1971, with a principal place of business located at 173 Chelsea Street, Everett, Massachusetts. COPYQUIK was engaged in the business of commercial printing, offset printing, copying, and related services.

The Debtor accepted an offer of employment as controller of COPYQUIK in August of 1986 at an annual salary of $40,000. In her capacity as controller, the Debtor supervised the accounting department of COPYQUIK, which had eight employees, and assisted in the maintenance of the general ledger. The Debtor testified that although she interviewed prospective employees she lacked final authority to hire and fire them. Her testimony was contradicted by that of Berardino, her predecessor as controller of COPYQUIK, who became Senior Vice–President, Treasurer, and Operations Manager when Bourque was hired. He testified that Bourque had authority to hire and fire her staff.

Bourque testified that she received two raises during the term of her employment, one in the amount of $2,500 and the other in kind—the use of a two-year old Buick Regal. She was also given the title of Vice–President during the term of her employment, although she testified that she was given no additional duties or compensation. Moreover, the Debtor testified that she was demoted in October of 1988 to staff accountant and relieved of check signing authority. The Debtor ceased to be employed by COPYQUIK in December of 1988. Berardino's testimony was somewhat inconsistent. He did not recall that the Debtor was given the title of Vice–President. Additionally, he testified that the Debtor earned approximately $50,000 per year.

The Debtor was not involved in the day-to-day operations of COPYQUIK. Her responsibilities revolved around the accounting department and the preparation of pro-

---

1. Section 109(e) provides:

    (e) Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000, or an individual with regular income and such individual's spouse, except a

    stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated unsecured debts that aggregate less than $100,000 and noncontingent, liquidated, secured debts of less than $350,000 may be a debtor under chapter 13 of this title.

    11 U.S.C. § 109(e).

jections and other financial reports for CO-PYQUIK's president, Robert Chilton ("Chilton"). Indeed, at one time, she travelled to California to review the books and records of a company that COPYQUIK's president and senior management contemplated acquiring. Bourque testified that she presented her findings to Chilton but was not consulted about the advisability of the acquisition.

The corporate officers of COPYQUIK, during the period of Bourque's employment included the following:

President:       Chilton

Vice–President:  Berardino

Treasurer:       Berardino

Secretary:       Carol Chilton

Berardino testified that he earned approximately $82,000 per year and that Chilton earned approximately $130,000 per year. He also testified that other members of COPYQUIK's management team included William Corrigan, Vice–President for Sales and Marketing, who earned approximately $65,000 per year, John DeBaie, Vice–President for Finance, who earned approximately $55,000 per year, Ron Valentine, a Sales Representative whose salary Berardino could not recall, and Bill Mullinax, COPY-QUIK's Purchasing Agent, who earned approximately $30,000 per year.[2] Berardino stated that Bourque also was a member of the management team.

At no time was the Debtor either a director, or stockholder. However, all other members of the management team owned stock in COPYQUIK. Chilton owned 51 percent of the stock. Berardino testified that he invested a total of $80,000 to obtain a four percent interest in the company, taking out a mortgage on his home to raise the money. When asked if it was his idea to purchase the stock or whether Chilton requested that he purchase stock, Berardino responded: "It was a situation where if you didn't purchase the stock it would leave you in a very adverse position with

the company.... He [Chilton] was the type of—he was somewhat vindictive and if you weren't 180 percent on [sic] his camp you were outside his camp."

COPYQUIK maintained two bank accounts—an operating account and a payroll account. The operations account was funded on a daily basis through a revolving loan based upon eligible receivables, while the payroll account was funded from checks drawn on the operating account. During the periods for which the Debtor was assessed, she had authority to sign checks drawn upon both the operating and payroll accounts maintained by COPYQUIK. No countersignature was required with respect to any check signed by the Debtor nor was there any limitation on the dollar amount of checks that the Debtor had authority to sign. The only other people with check signing authority with respect to the checking accounts maintained by COPYQUIK during the periods for which the Debtor was assessed were Chilton and Berardino. Bourque, Chilton and Berardino were the only people with keys required to gain access to the locked cabinet where the blank checks of COPYQUIK were kept.

The payroll and payroll checks were computed and generated by COPYQUIK'S computer. No outside payroll service was used during the periods for which the Debtor was assessed. The payroll account was funded by a check payable in the amount of the net payroll, not an amount equal to the gross wages due the employees *plus* the withheld state and federal employment taxes. When the taxes were paid, they were drawn from the operating account.

The amount of the accrued and unpaid federal and state employment taxes was an item that appeared upon the monthly financial statement prepared by the Debtor. Each month the accounting department generated a list of accounts payable and other corporate obligations and arranged the obligations in the order of their priority for payment. The Debtor testified that the

---

**2.** Berardino's testimony is inconsistent with the 1988 W–2 forms that comprise agreed exhibit 6. The W–2s reveal the following salaries in round figures: Chilton–$170,000; Berardino–$77,000; Bourque–$45,000; Corrigan–$33,000; DeBaie–$40,000; Valentine–$45,000; and Mullinax–$31,000.

order could be changed weekly or daily at the behest of Chilton or Berardino. Although Berardino testified that Bourque had discretion to pay bills, at least when there were sufficient funds on hand to pay them, the Debtor testified that she did not have final authority to determine which bills to pay and when. However, the Debtor did state that neither Chilton nor Berardino reviewed every check that the company issued.

The Debtor, in her capacity as controller of COPYQUIK, prepared, signed and was responsible for filing federal and state tax returns for COPYQUIK. The Debtor, in her capacity as controller of COPYQUIK, prepared and filed quarterly federal employers tax returns (Form 941) on behalf of COPYQUIK. The Debtor was at all times aware that the withholding taxes were not being paid over to the IRS. During the periods for which the Debtor was assessed, sales taxes and unemployment taxes owed to the Commonwealth of Massachusetts were not maintained in current status. The Debtor was at all times aware of which creditors of COPYQUIK were being paid and issued checks in payment to the creditors. The Debtor, in her capacity as controller of COPYQUIK, was responsible for the preparation of the W–2 forms issued to the employees of COPYQUIK.

When Bourque first became employed at COPYQUIK, the company had approximately $3 million in sales and 75–90 employees. Through the course of her employment, the company grew substantially through the creation of satellite offices and the acquisition of other companies. Sales increased dramatically and the number of employees increased to approximately 150. The Debtor testified that COPYQUIK had cash flow problems that were particularly severe in the summer because of COPYQUIK's reliance upon the educational market as a source of revenue. During the summer of 1988, several problems emerged that became increasingly serious and eventually led to the demise of COPYQUIK.

The availability under the line of credit was determined using a form completed by the office manager in the accounting department. In the summer of 1988, Bank of New England (the "Bank") had over advanced COPYQUIK in excess of $130,000. According to Berardino, this was due, in part, to Bourque's failure to reconcile the loan account with the collateral base, and, in part, to the Bank's negligence. Moreover, in September of 1988, Bourque admitted that, at Chilton's direction, she had adjusted the accounts receivable aging submitted to the Bank to make approximately $200,000 in over 90–day receivables eligible for advances under the revolving line of credit. Additionally, in October of 1988, Bourque and Berardino discovered that COPYQUIK's purchasing agent had failed to report over $120,000 in invoices at Chilton's direction. Both the movement of receivables from the over 90–day category to the under 90–day category and the failure to account for invoices distorted COPYQUIK'S books, making the financial condition of the company appear much better than it actually was.

Bourque testified that when she returned from vacation in the summer of 1988 she discovered that the withholding taxes had not been paid in her absence. In August of 1988, Chilton, Berardino and Bourque met to discuss the company's failure to pay withholding taxes. Although a strategy was devised for attempting to pay the taxes, they remained unpaid. Bourque and Berardino met with an IRS representative, but the meeting did not result in payment of the taxes owed. At about the time of this meeting, Berardino testified that Bourque confided in him that Chilton had been diverting money from the company and paying $90,000 per year to his daughter for a no-show job. Both Bourque and Berardino attributed COPYQUIK's financial problems to Chilton's mismanagement. Indeed, Berardino described himself and Bourque as Chilton's victims. Berardino emphasized the pressure Chilton placed upon Bourque to not only do her job in the accounting department but to prepare projections and financial evaluations of companies he contemplated acquiring—work that caused Bourque to put in long hours at COPYQUIK. Berardino stated: "He [Chil-

ton] would put tremendous pressure on her to accomplish impossible tasks."

Although Bourque admitted that she was aware that the taxes were not being paid, she testified that she had no authority to pay the taxes or any bills without Chilton's express authority. Berardino's testimony, noted above, was not wholly inconsistent with Bourque's. He stated that Bourque had the discretion to establish priorities for the payment of bills. However, he admitted that, whenever there were insufficient monies to pay taxes, Chilton had the final word on what bills to pay and when, both at the time he was controller and during the Debtor's tenure as controller. He stated: "[t]here was never a tax depository that was not made that he was not consulted with and he made the final decision on it." Berardino confirmed that Bourque spent a considerable amount of her time meeting with Chilton in his office, evidence that could lend credence to Borque's testimony that she never drafted, signed or sent out any checks without either Berardino's or Chilton's approval. Most importantly, Chilton, in a letter to the IRS dated May 8, 1988 and signed under the pains and penalties of perjury, stated:

> I am President and the majority shareholder of Copy Quick, Inc. [sic] (the "Corporation"). Please be advised that Janice Bourque, as an employee of the Corporation, undertook all actions under my complete supervision and direction. In her capacity as employee, Janice Bourque was not the responsible person for the payment over on behalf of the Corporation of any taxes (withholding, sales, income or other taxes) to the Internal Revenue Service.[3]

Finally, the Debtor testified that if she had made payments to the IRS without Chilton's express approval she would have lost her job.

---

3. The Court admitted Bourque's claim for an abatement (Form 843) without objection. Chilton's letter was attached to Form 843 as Exhibit B. The letter is admissible under Fed.R.Evid. 804(b)(3). Neither Debtor's counsel nor counsel for the IRS knew the precise whereabouts of Chilton. He was thought to be living in either

## III. BURDEN OF PROOF

The IRS asserts that after a penalty is assessed under section 6672 of the Internal Revenue Code the taxpayer has the burden of proving either that she was not a responsible person or that the failure to pay the tax was not willful. According to the IRS, the taxpayer's burden never shifts to the IRS. *See, Caterino v. United States,* 794 F.2d 1, 5 (1st Cir.1986), *cert. denied,* 480 U.S. 905, 107 S.Ct. 1347, 94 L.Ed.2d 518 (1987) ("... a person who challenges a section 6672 assessment bears the burden of persuasion to prove lack of control."); *United States v. Rexach,* 482 F.2d 10, 16–17 (1st Cir.1973), *cert. denied,* 414 U.S. 1039, 94 S.Ct. 540, 38 L.Ed.2d 330 (1973) (same); *In re Mason,* 118 B.R. 170, 172 (Bankr.D.Mass.1990) (same).

Noting that the two First Circuit cases upon which the IRS principally relies were non-bankruptcy cases, the Debtor maintains that in the bankruptcy context an exception exists to the general rule that the burden of proof rests with the taxpayer where a taxing authority has filed for delinquent taxes. The Debtor relies upon *In re Premo,* 116 B.R. 515 (Bankr.E.D.Mich. 1990). In that case, the court examined the five relevant factors utilized by the court in *Rexach, supra,* and determined that despite the divergence of opinion on the issue, the better view is not to recognize an exception to the well-established bankruptcy rules allocating to the creditor the ultimate burden of persuasion in claims litigation. Thus, according to the Debtor, pursuant to 11 U.S.C. § 502(a) and Fed.R.Bankr.P. 3001(f), a properly executed proof of claim constitutes *prima facie* evidence of the validity and the amount of the claim. The party objecting to the claim has the burden of going forward to overcome this presumption, leaving the burden of ultimate persuasion on the claimant—the IRS. *In re Premo,* 116 B.R. at 518.

northern New Jersey or northern Massachusetts. Bourque recognized Chilton's signature on the letter. Parenthetically, during opening statements, counsel for the IRS stated that due to a bureaucratic snafu Chilton was not assessed for the unpaid withholding taxes.

For the reason stated in *In re Premo, supra,* the Court hereby rules that the IRS bears the ultimate burden of persuasion.

## IV. LEGISLATION AND CASE LAW

■ The Internal Revenue Code requires employers to withhold social security and federal income taxes from the wages paid to employees, *see* 26 U.S.C.A. § 3102, 3402 (West 1989), and to hold the amounts withheld in trust for the United States. *Id.* at § 7501. Since the IRS has no recourse against employees who have had taxes withheld by their employer, the IRS, pursuant to section 6672 of the Internal Revenue Code, imposes liability on certain individuals who are deemed to be in positions to determine whether the withheld taxes are paid to the IRS. Section 6672(a) provides in relevant part:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable for a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over....

26 U.S.C.A. § 6672(a) (West 1989 & Supp. 1992). For purposes of section 6672, "person" is defined as "an officer or employee of a corporation ... who as such officer, employee ... is under a duty to perform the act in respect of which the violation occurs." *Id.* at § 6671(d). As the court noted in *Godfrey v. United States,* 748 F.2d 1568 (Fed.Cir.1984),

The purpose of the 100 percent penalty provision 'is to permit the taxing authority to reach those [persons] responsible for the corporation's failure to pay the taxes which are owing.' Though the legislative history is uninformative, 'it is evident from the face of the section [§ 6672] was designed to cut through the organization form and impose liability upon those actually responsible for an employer's failure to withhold and pay over the tax.'

748 F.2d at 1574 (citations omitted). More than one person may be assessed pursuant to section 6672 of the Internal Revenue Code, and each person assessed is liable for the total amount of unpaid withholding taxes. *Monday v. United States,* 421 F.2d 1210 (7th Cir.), *cert. denied,* 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970).

The Court of Appeals for the First Circuit has stated that two elements are essential to liability under section 6672: the person must be "responsible" and act "willfully." *Caterino v. United States,* 794 F.2d at 3. According to the court, the term "responsible" has been defined broadly using an elastic definition with emphasis on

the function of an individual in the employer's business, not the level of the office held: whether the person had the power to determine whether the taxes should be remitted or paid or had 'the final word as to what bills should or should not be paid and when' ... '[T]he word "final" means significant rather than exclusive control over the disbursement of funds.'

*Id.* at 5.

Other courts, focusing on the first element of the test, have determined that "[r]esponsibility ... is a matter of status, duty and authority." *Thomsen v. United States,* 887 F.2d 12, 16 (1st Cir.1989); *Howard v. United States,* 711 F.2d 729, 734 (5th Cir.1983); *Mazo v. United States,* 591 F.2d 1151, 1156 (5th Cir.1979), *cert. denied sub nom, Lattimore v. United States,* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). With respect to a person's "duty", the court in *Godfrey, supra* stated:

A person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. It is a test of substance, not form. Thus, where a person has authority to sign the checks of the corporation, or to prevent their issuance by denying a necessary signature, or where that person controls the disbursement of the payroll, or controls the voting stock of the corporation, he will generally be held responsible.

748 F.2d at 1576. "Authority to pay in this context means *effective power* to pay, and the possibility of being fired for disobeying instructions not to pay the taxes does not make a person any less responsible for payment." *Howard v. United States*, 711 F.2d at 734.

The court in *In re Premo, supra,* considered whether the ultimate authority to control corporate tax payments is equivalent for purposes of section 6672 to having a "duty" to make such payments. It noted that the term "duty" is defined as "obligatory tasks, conduct, service, or function that arise from one's position", while the word "authority" is defined as the "power to influence or command thought, opinion, or behavior." 116 B.R. at 525, *quoting Webster's Ninth New Collegiate Dictionary* (1985). Accordingly, it determined that the terms were not synonymous, and the IRS's reliance upon *Monday v. United States*, 421 F.2d 1210 (7th Cir.), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970), was misplaced. In *Monday*, the court ruled that corporate office does not *per se* impose the duties imposed by section 6672: "[l]iability attaches to those with the power *and responsibility* within the corporate structure for seeing that the taxes withheld from various sources are remitted to the Government." 421 F.2d at 1214–15. The court went on to state that "[t]his duty is generally found in high corporate officials charged with general control over corporate business affairs who *participate* in decisions concerning payment of creditors and the disbursal of funds. *Id.* (emphasis in original).

In *Datlof v. United States*, 252 F.Supp. 11 (E.D.Pa.1966), *aff'd*, 370 F.2d 655 (3d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 624 (1967), the court identified a number of factors useful in determining whether an individual is a responsible person. These included the following: 1) contents of the corporate by-laws; 2) the ability of the individual in question to sign the company's checks; 3) the identity of the person signing the tax returns; 4) the payment of other creditors instead of the United States; 5) the identity of the officers, directors and principal shareholders;

6) the identity of the individuals who hired and fired employees; and 7) the identity of the individual who was in control of the financial affairs of the company. *Id.* at 32–33. *See also Hochstein v. United States*, 900 F.2d 543, 547 (2d Cir.1990); *Thomsen v. United States*, 887 F.2d at 16.

The Court of Appeals for the First Circuit has defined the second element for imposition of liability as follows:

Willfulness in this context is the 'voluntary, conscious, and intentional decision to prefer other creditors to the United States.' Any responsible person who knows the taxes are not paid and allows the business to pay other creditors acts willfully. Evil motive and specific intent are not necessary elements. Mere knowledge, or reckless disregard for known risks, is sufficient.

*Caterino*, 794 F.2d at 6 (citations omitted). The court added "[w]illfulness ... means no more than knowledge that taxes are due and withheld and conscious disregard of the obligation to remit them." *Id.*

In short, courts have refused to exonerate responsible parties who have argued that they would have been fired for paying the taxes and were just following the orders of their superiors (the so-called "Nuremburg defense"), *Gephart v. United States*, 818 F.2d 469 (6th Cir.1987); *Roth v. United States*, 779 F.2d 1567 (11th Cir. 1986); *Howard v. United States, supra,* or that there were no corporate funds available to pay the taxes because of a trust arrangement with a bank requiring the payment of other creditors first, *Emshwiller v. United States*, 565 F.2d 1042, 1045 (8th Cir.1977), or that they believed in good faith that they were required by state law to prefer the payment of wages to employees over the federal government, *Hochstein v. United States*, 900 F.2d 543, 549 (2d Cir.1990). Indeed, in *Howard*, the court stated:

Had Jennings [the president and majority stockholder] fired Howard for paying the taxes, Howard would at least have fulfilled his legal obligations. Faced with the possibility of leaving the frying pan with only minor burns, Howard chose

instead to stay on in the vain hope of avoiding the fire. While we appreciate the difficulty of his position, we cannot condone his abdication of the responsibility imposed upon him by law.

711 F.2d at 734 (footnote omitted). In *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir.1975), the court explained that the proper course for potentially responsible persons who have insufficient resources to pay all corporate liabilities is to prorate what funds are available between the government and the employees to insure that the United States is preferred over the employees.

This Court has reviewed the case law with an eye toward cases in which the assessed taxpayer was never a shareholder, director or officer of the corporation that failed to pay withholding taxes. In the recent case of *Hochstein, supra*, Hochstein was controller of a manufacturing business. Although he was not a shareholder, director, or officer, he was responsible for overseeing the finances of the corporation, preparing the payroll, and filing the payroll tax returns. He was one of only two individuals authorized to sign corporate checks. He was the primary person dealing with the company's secured lender, requesting advances based upon a formula. He made the initial determination of the order in which large bills were to be paid, subject to the approval of the company's president, and he had the discretion to pay smaller obligations. When the company encountered financial problems, a decision was made to liquidate the company and the lender advanced only enough money to cover essentials and net wages. Withholding taxes were not paid. The circuit court vacated the judgment of district court, stating that its finding that Hochstein was not a responsible person was clearly erroneous. The circuit court rejected Hochstein's argument that he lacked ultimate authority because he had significant authority to determine whether the government or other creditors should be paid. The court found that he was a responsible person within the meaning of section 6672. It stated:

While we accept the district court's finding that Hochstein was never actually an officer or director of Safelon [the company], we believe that his being held out as an officer of the corporation, for whatever reason, is relevant to his status as a responsible person. The fact that Eckstein [the president] allowed Hochstein to be identified as a corporate officer suggests that Hochstein occupied a fairly high position within the company, and his identification as treasurer implies that his role in Safelon's finances was more than clerical.

900 F.2d at 548 n. 1.

Likewise, in *Hanshaw v. United States (In re Hanshaw)*, 94 B.R. 753 (Bankr. M.D.Fla.1988), the court found that the debtor was a responsible person within the meaning of section 6672. The debtor was controller of a strip mining coal company which conducted business with approximately 45 vendors and had a payroll for 67 employees. The debtor had check signing authority. His duties included preparing financial reports, communicating with vendors, interacting with outside accountants, overseeing the accounting functions performed by the office manager, controlling the general ledger and the corporate check books, preparing and signing state and federal tax returns including 941s and making tax deposits. The debtor argued that he had no authority to hire or fire employees without prior authority, no authority to negotiate loans or procure credit or pay the IRS without prior approval. In short, the debtor maintained that he "was little more than the breathing equivalent of a check writing machine and could not direct the disbursement of corporate funds independently." 94 B.R. at 757. The bankruptcy court rejected the debtor's arguments. The court found that he was "responsible" since in substance he was the chief financial officer of the company.

## V. DISCUSSION

In light of the evidence and the factors identified by the *Datlof* court and others, this Court finds that Janice Bourque was a responsible person and acted willfully. Despite Bourque's testimony and Chilton's letter, this case is simply indistin-

guishable from *Hochstein* and *Hanshaw.* As the head of COPYQUIK'S accounting department, Bourque supervised both the accounts payable clerk that generated the prioritized list of corporate obligations and the office manager that completed the forms necessary to maintain COPYQUIK's line of credit and lending relationship with Bank of New England. Bourque was personally responsible for preparing the 941's and W–2s, as well as signing payroll and other checks. Like the court in *Hanshaw,* this Court simply cannot find that Bourque, a $45,000 per year employee with an MBA, supervising a staff of eight, was 'the breathing equivalent of a check writing machine and could not direct the disbursement of funds independently." *Hanshaw,* 94 B.R. at 757.

Bourque's special circumstances as a single parent of a physically disabled child add an element of emotional and economic compulsions to Chilton's instructions. However, in view of the facts and the law, this Court cannot find that Bourque did not exercise significant control over COPYQUIK's finances and did not act willfully as that term has been defined by the Court of Appeals for the First Circuit. *See Caterino v. United States,* 794 F.2d at 6. Nevertheless, the Debtor's special circumstances elicit compassion and should induce the IRS to adjust its claim accordingly, particularly in view of its failure to assess the individual who profitted most from COPYQUICK's derelictions—Robert Chilton.

## VI. CONCLUSION

In accordance with the foregoing, the Court overrules the Debtor's objection to the claim of the IRS, and *sua sponte* dismisses the Debtor's Chapter 13 case pursuant to 11 U.S.C. 109(e). The foregoing shall constitute findings of fact and rulings of law in accordance with Fed.R.Bankr.P. 7052. An appropriate order shall enter.