**In re John J. HAYES, III, Debtor.**

**Bankruptcy No. 97–16640–WCH.**

United States Bankruptcy Court,
D. Massachusetts.

April 12, 1999.

John F. Drew, Lane, Altman & Owens LLP, Boston, Massachusetts, for the debtor.

Henry J. Riordan, U.S. Dept. of Justice, Washington, D.C., for the I.R.S.

## DECISION ON OBJECTION TO CLAIM OF THE INTERNAL REVENUE SERVICE

WILLIAM C. HILLMAN, Chief Judge.

### I. Introduction

John J. Hayes, III (the "Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on July 11, 1997. The United States of America (the "IRS") timely filed a proof of claim which, as amended, asserted the Debtor's liability to it to be $125,172.70.[1] The IRS claim is based upon assessments which it made against the Debtor pursuant to 26 U.S.C. § 6672[2] by reason of his willful failure to collect, truthfully account for and pay over the trust fund portion of federal income and "F.I.C.A." taxes withheld from the wages of the employees of two corpora-

tions, Second Lower Shaker Village Inn, Inc. ("SLV") and Outer Investment, Inc. ("OI"). The Debtor objected to the claim on the grounds that he was not a responsible party and had no knowledge regarding the payment of taxes.

This is a core matter. 28 U.S.C. § 157(b)(2)(B). I ruled that I would bifurcate the trial into liability and damages determinations and held a two day trial as to the liability issue only. I then took the matter under advisement. Both parties have filed post-trial memoranda.

After consideration, and for the reasons given below, I overrule the objection of the Debtor to the amended proof of claim of the IRS.

### II. Findings of Fact

#### A. Background

The Debtor and Kevin O'Reilly ("O'Reilly") had known each other in the real estate business in the Boston area for twenty years.[3] They were good friends.[4] In 1988, they agreed to organize First Leader Corporation ("FLC").[5] The Debtor became a 44–45% shareholder,[6] one of two directors, and treasurer of FLC.[7] O'Reilly and his wife also owned the same percentage of the FLC stock, with O'Reilly acting as president and the other director.[8] The Debtor and O'Reilly shared financial control of FLC.[9]

---

1. IRS Ex. 2.

2. That statute provides in part as follows:

   Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of tax evaded, or not collected, or not accounted for and paid over.
   26 U.S.C. § 6672(a).

3. Transcript of hearing of December 2, 1998, at page 61 (hereafter "1T–61"). References

to "2T" are to the transcript of the continued hearing held December 3, 1998.

4. *Id.*

5. 1T–6; 2T–6.

6. The Debtor usually used the 44% figure; O'Reilly 45%. *See* 2T–5. Investors held the remainder of the shares.

7. 1T–42, 44; 2T–9.

8. 2T–9.

9. 1T–44; 2T–13. The implication in the United States' Post-trial Memorandum, ¶ 15 that the Debtor alone was in financial control is

O'Reilly and the Debtor formed FLC to purchase "Center Village" in Enfield, New Hampshire.[10] Center Village was a former Shaker community and the property consisted of land improved with several buildings including an inn and restaurant which held an active liquor license.[11] FLC purchased Center Village with the intent of developing some of the properties and selling off others.[12] FLC did not intend to retain the inn and restaurant but rather sought to keep them operating long enough to sell or lease them as an ongoing business.[13]

During the events described below, the Debtor worked full time in Boston as a lawyer.[14] He travelled to Center Village at least once a month, if not more, as he had an office there and owned residential condominiums.[15] O'Reilly maintained an office in Center Village and was at the site daily.[16] When they started out, both the Debtor and O'Reilly contributed the capital to develop Center Village.[17]

For a period of time, FLC was successful with its business strategy.[18] It was able to sell some of the properties.[19] In approximately early 1990, due to an economic downturn, FLC's plans were stalled. In order to maintain a cash flow, FLC turned its efforts toward improving the inn and restaurant.[20] It was approximately at this time that O'Reilly was no longer able to make capital contributions and the Debtor became the sole source of funds beyond the often insufficient revenue that the inn and restaurant generated.[21]

To that end, FLC decided to form SLV to run the inn and restaurant at Center Village. An incorporator formed the corporation in April of 1989.[22]

The same incorporator who formed SLV, formed OI in 1990.[23] SLV and OI had the same function.[24] The testimony reflects that at some point in 1991, OI took over the running of the inn and restaurant so that the inn and restaurant would be running on a "clean slate".[25]

In December of 1990, the IRS sent SLV a notice of intent to levy.[26] In April of

simply at odds with the Debtor's testimony at his deposition and on cross examination, *see* 1T–44, O'Reilly's testimony, *see* 2T–13, and that of the employees of the management company mentioned elsewhere in this Decision.

10. 1T–6.

11. 2T–4, 15, 16.

12. 2T–7, 8. The Debtor and O'Reilly guaranteed the mortgages which were obtained to purchase the property.

13. 2T–16.

14. 1T–5. Also at this time, the Debtor owned 70–80 apartment and condominium units in the Boston area. 1T–93.

15. 1T–54; 2T–110.

16. 1T–14, 15, 65; 2T–14, 25.

17. 2T–15.

18. 2T–8.

19. *Id.*

20. 2T–17

21. 1T–17. The Debtor testified that when called, he would be given a requested amount and an itemization. 1T–18. He testified that payroll might have been included in that itemization. *Id.*

22. Debtor Ex. 1.

23. 1T–4.

24. 1T–42. The testimony reflected that all parties considered SLV and OI to be wholly owned subsidiaries of FLC. The Debtor argued both at trial and in his post-trial brief that it would have been impossible as a matter of federal tax law at that time for FLC to have a wholly owned subsidiary. In this case, the argument makes a distinction without a difference. Even if SLV and OI were not wholly owned subsidiaries, there was no testimony suggesting that anyone other than O'Reilly and Hayes held interests in the two corporations.

25. 1T–96.

26. IRS Ex. 28–A.

1991, the IRS sent a second notice to SLV.[27]

At the end of 1991, the Debtor began to look for assistance in running OI because he knew that the inn and restaurant were in financial trouble.[28] Because of this financial trouble and the fact that they had no expertise in running an inn and restaurant, O'Reilly and the Debtor decided to hire Baron Management.[29] Baron Management ran the inn and restaurant until early 1993.[30] After that time, OI assumed control once again.[31]

In October of 1994, both SLV and OI filed for bankruptcy. At that time, both corporations were deeply indebted to the IRS. SLV's indebtedness arose from unpaid income and F.I.C.A. taxes it withheld from employees during all four quarters of 1990 and the first two quarters of 1991.[32] OI's indebtedness arose from unpaid income and F.I.C.A. taxes it withheld from employees during the last three quarters of 1991, the first quarter of 1992, the last quarter of 1993, and the second, third and fourth quarter of 1994.[33] In 1994 and 1995, the Debtor was assessed for theses taxes pursuant to 26 U.S.C. § 6672.[34]

## B. *The Officers and Directors of SLV and OI*

Much of the testimony at trial and the post-trial briefs focused on the identity of the officers and directors of SLV and OI. In the Articles of Incorporation of SLV, O'Reilly and the Debtor are listed as directors.[35] O'Reilly testified that he and the Debtor were the directors and that he was the president and the Debtor was the treasurer.[36]

At trial, the Debtor admitted that although he previously testified and affirmed on several occasions that he was the treasurer of SLV,[37] when reviewing the corporate documents which the IRS produced, he did not see his name on any documents.[38] On this basis, in his post-trial brief, the Debtor clarified that at trial he recanted his earlier sworn statements. He did not provide any other documentation which would reflect that he was not the director or the treasurer. Based upon the evidence which supported the IRS's claim and the Debtor's unconvincing and unsubstantiated rebuttal, I find as a fact that the Debtor was a director and treasurer of SLV.

---

**27.** IRS Ex. 28–B.

**28.** 1T–48, 78.

**29.** 1T–48, 78. In his post-trial brief, the Debtor asserted that the testimony verified that Baron Management did not come in to manage the inn and restaurant until 1992. In reviewing the testimony, I find that Baron Management was on the premises by late 1991. 1TR–104, 107, 146, 152.

**30.** The employees of Baron Management testified that the tax problem was a common topic of conversation with the Debtor. 2T–109.

**31.** Both before and after Baron Management ran the inn and restaurant, the corporations hired a bookkeeper.

**32.** IRS Ex. 2.

**33.** *Id.*

**34.** IRS Ex. 5, 6, 7, 8, 9, 10, 11, 12, 13.

**35.** Debtor Ex. 1

**36.** 2T–10. In his post-trial brief, the Debtor contends that since O'Reilly was the sole director of SLV during the period of delinquencies, as a matter of new Hampshire law the Debtor could not have been a director during that period. However, the evidence is otherwise.

**37.** In his bankruptcy petition and in his objection to the IRS' proof of claim, the Debtor stated that he was an officer and a treasurer of both SLV and OI. During his may 4, 1994 interview with the IRS, the Debtor stated that he was the treasurer of the corporation. IRS Ex. 22.

**38.** The Debtor testified that "[a]s I reviewed your documents that you brought to the hearing or to the session, I don't see my name on any of these corporation papers and I don't recall signing any." 1T–44. It is interesting, however, that the Debtor attempted to introduce evidence "as an officer of the corporation." 1T–12.

With respect to OI, the Debtor acknowledged that he previously testified under oath and signed a sworn statement that he was the treasurer and a director of OI.[39] At trial, however, he testified that he was neither an officer nor a director of OI.[40]

O'Reilly testified at trial that when the corporation was initially formed he was the sole director and the president. He testified that his wife may have been the treasurer.[41] He also testified that the Debtor possibly later became a director and that he assumed the role of treasurer.[42] During a 1994 interview with the IRS, O'Reilly reported that the Debtor was a director from 1989 to the date of the report and that he was a treasurer during that period as well.[43] The Debtor in his post-trial brief, points to this testimony as demonstrative of O'Reilly's lack of credibility given that the Debtor could not have been a director in 1989 since OI was not incorporated until 1990. I find this inconsistency only substantiates O'Reilly's constant admonitions that he was horrible with dates; it does not belie the credibility of his assertions regarding the positions which the Debtor held.[44]

Before SLV and OI filed for bankruptcy, it was the Debtor who contacted an attorney for the corporations.[45] In November, O'Reilly signed the bankruptcy petition.[46] In the Statement of Financial Affairs, O'Reilly explained that he and the Debtor were the officers and directors and 50% shareholders of each corporation.

Based upon the evidence supporting the IRS's claim and the unconvincing and unsubstantiated denials of the Debtor, I find that the Debtor was at least the treasurer of OI.

### C. *Other Duties*

Hayes testified [47] that he did not
- have authority to hire or fire employees.
- in fact hire or fire employees.
- manage, or have authority to manage, employees on a day-to-day basis.
- direct, or believe that he had authority to direct, that specific vendors be paid or not paid.[48]
- deal directly with suppliers or customers, or have authority so to do.[49]
- exercise control over any corporate bank account.
- believe that he had signature authority over such accounts.[50]
- participate in preparing or have knowledge of Federal payroll tax returns.[51]

With respect to hiring or firing employees, there was direct evidence to the contrary. Patrick Pallatroni, the innkeeper, stated that he was "let go" by the Debtor.[52] The Debtor denied so doing,[53] but I find Pallatroni's testimony to be credible

39. 1TR–45. *See also* 1T–12.

40. 1TR–20. *See also* n. 35.

41. 2TR–11

42. 2TR–11–12.

43. 2T–75. IRS Ex. 30.

44. 2T–22, 51.

45. 1TR–74.

46. IRS Ex. 23.

47. 1T–15, 16.

48. An employee testified otherwise. 1T 169.

50. O'Reilly substantiated this representation. 2T–87.

51. The testimony reflects otherwise. *See* discussion in Section IV B of this Decision.

52. 1T–133.

53. 1T–46–47. In his post-trial brief, the Debtor asserts that "Hayes does not dispute that he informed Pallatroni that he was terminated but was relaying the decision of O'Reilly because O'Reilly did not want to fire his brother-in-law face to face." Debtor's post-trial brief at 14. A careful search of the transcript, manually and with computer assistance, has failed to find any such testimony.

on this point and accept it. Pallatroni considered both the Debtor and O'Reilly, his brother-in-law, to be his bosses.[54]

The Debtor recommended the chef for the restaurant who was eventually hired. Stephen Millay, an employee of Baron, testified that toward the end of the inn's existence, it was the Debtor who sought out someone from Rhode Island for assistance in running the inn.[55] The Debtor testified that although he found Baron Management and was the one who initially dealt with them,[56] he only recommended Baron Management.[57] Later, however, he testified that "Kevin and I decided to hire them." [58]

Hayes stated in an interview with an IRS agent regarding SLV that he "determine[d] Company financial policy." [59] He explained that answer as follows:

I was—had a large investment in the First Leader Corporation which owned the buildings which these businesses [SLV and OI] were operating out of. I was financially involved in the buildings themselves and, thusly, in that these corporations were supposed to pay rent, which they couldn't pay rent, I was thusly, as I understand it, involved in the financial policy to that degree.[60]

Stephen Millay described the Debtor's involvement in this way:

He pretty much held the purse strings to the property. He had the money. He was the investor.[61]

## III. Applicable Legal Standard

### A. *Burden of Persuasion*

Judge Young explained the burden of proof with respect to proofs of claim in bankruptcy as follows:

Prepetition claims are asserted by means of a proof of claim ... A properly filed proof of claim is prima facie evidence of the validity and amount of the claim ... 'The interposition of an objection [by the debtor] does not deprive the proof of claim of presumptive validity unless the objection is supported by substantial evidence.' ... Only once the debtor meets this initial burden of producing substantial evidence does the question of which party bears the ultimate burden of proof come into play.

*Thinking Machines Corp. v. New Mexico Taxation and Revenue Dept. (In re Thinking Machines Corp.)*, 211 B.R. 426 (D.Mass.1997) ("*Thinking Machines II*") (citations omitted).

■ With respect to the ultimate burden of proof, it is settled that, outside of bankruptcy, "the person challenging an assessment under § 6672(a) bears the burden of proving that he is not a responsible person." *Vinick v. Commissioner*, 110 F.3d 168, 171 (1st Cir.1997), citing *Caterino v. United States*, 794 F.2d 1, 5 (1st Cir.1986). The matter is less settled in the bankruptcy courts. Judge Young has summarized the state of the law:

Subject to certain exceptions, the United States Bankruptcy Code confers juris-

---

**54.** 1T–133. Throughout his testimony Pallatroni attributed management control to "Kevin and John", with Kevin being "on campus" more often. *See passim* 1T–133–144, 146. The other employees who testified also stated that they considered both the Debtor and O'Reilly to be their bosses. 1T–115, 164.

**55.** 2T–167.

**56.** 1T–59.

**57.** 1T–48.

**58.** 1T–78.

**59.** IRS Ex. 22, p. 4. This naked reference on an IRS form is not supported by the testimony at trial, even though the IRS asserts otherwise. IRS post-trial brief at ¶ 18.

**60.** 1T–27. *See also* 1T–32, 33. It appears SLV and OI were making direct mortgage payments instead of paying rent to FLC. When the town was threatening to foreclose, it was the Debtor and a town employee who went to the town offices to address the real estate taxes. 1T–158–159.

**61.** 1T–157.

diction upon the bankruptcy courts to "determine the amount or legality of any tax" assessed against the debtor. 11 U.S.C. § 505. The Bankruptcy Code and the Federal Bankruptcy Rules of Procedure are silent, however, with respect to the proper allocation of the ultimate burden of proof when a tax claim is asserted in bankruptcy, and indeed with respect to the ultimate burden of proof for any claim asserted against the debtor. *See* 11 U.S.C. § 502; Fed. R.Bankr.P. 3001(f). Although courts generally assume that this ultimate burden rests with the claimant, the federal circuit courts of appeals are split on the question of whether the ultimate burden falls upon the taxpayer or the taxing authority when a tax claim is asserted in the context of a bankruptcy proceeding. The Third, Fourth, and Seventh Circuits have held that the taxpayer-debtor bears the ultimate burden of proof, just as it does outside of bankruptcy, while the Fifth, Eighth, Ninth, and Tenth Circuits place the ultimate burden on the taxing authority. The First Circuit has yet to address the issue.

*Thinking Machines II*, 211 B.R. at 429–430 (case citations and footnote omitted).

That case involved issues of state taxation, and Judge Young held that the issue of burden of persuasion was controlled by state law. *Id.* In my decision below, *In re Thinking Machines Corp.*, 203 B.R. 1 (Bankr.D.Mass.1996) ("*Thinking Machines I*"), without reference to any state/federal dichotomy, I held that

> There is nothing in the Bankruptcy Code or Rules to suggest that Congress intended to supplant the well-established rule that the burden of proof rests on the taxpayer in a contest involving a tax assessment. Further, this conclusion is consistent with the goal of placing the claimant in the same position it would

have been absent the bankruptcy. Accordingly, I hold that the Debtor bears the ultimate burden of proving that the assessment is incorrect by a preponderance of the evidence.

*Thinking Machines I*, 203 B.R. at 4.

■ Whatever may be the effect of *Thinking Machines II* upon this conclusion as regards state taxation, I believe that it remains full viable when the taxing authority is the IRS, and I will follow it in the present case.[62]

### B. *Substantive Issues*

■ In order to overcome the presumptive correctness of the IRS' amended proof of claim, the Debtor must establish by a preponderance of the evidence that he (1) was not responsible to collect, account for and pay over the withheld taxes and (2) did not act wilfully as a matter of law. *Thinking Machines I*, 203 B.R. at 4; *U.S. v. Rem*, 38 F.3d 634, 643 (2nd Cir.1994).

The First Circuit has explained the standard for responsibility as follows:

> Courts have explicitly given the word "responsible" a broad interpretation. They have fashioned an elastic definition predicated upon the function of an individual in the employer's business, not the level of the office held: whether the person had the power to determine whether the taxes should be remitted or paid or had the final word as to what bills should or should not be paid and when. In the context of this case, the word "final" means significant rather than exclusive control over the disbursement of funds.

*Caterino*, 794 F.2d at 5 (case citations and internal quotations omitted).

It has further explained that

> In the absence of uncontroverted evidence establishing an individual's 'precise responsibility' to pay withholding taxes . . . or of specific acts of manage-

---

**62.** In his post-trial brief, citing *In re Bourque*, 153 B.R. 87 (Bankr.D.Mass.1993) and *In re Premo*, 116 B.R. 515 (Bankr.E.D.Mich.1990), the Debtor argued that the IRS bore the ulti-

mate burden of proof. In *Thinking Machines I*, I specifically declined to follow *In re Premo* and in this decision clarify that I respectfully decline to follow *In re Bourque*.

ment or financial decision-making that would manifest the level of control necessary for responsibility, various indicia may establish responsibility under § 6672(a). Such indicia include the holding of corporate office, the authority to disburse corporate funds, stock ownership, and the ability to hire and fire. *Vinick v. Commissioner of Internal Revenue,* 110 F.3d 168, 172 (1st Cir.1997).

*Caterino* also provides us with the definition of "willfulness":

> Willfulness in this context is the voluntary, conscious, and intentional decision to prefer other creditors to the United States. Any responsible person who knows the taxes are not paid and allows the business to pay other creditors acts wilfully. Evil motive and specific intent are not necessary elements. Mere knowledge, or reckless disregard for known risks, is sufficient.

794 F.2d at 6 (case citations and internal quotations omitted).

In *Thomsen v. United States,* 887 F.2d 12 (1st Cir.1989), the First Circuit explained that reckless disregard can be established if the taxpayer "(1) clearly ought to have known that (2) there was a grave risk that withholding taxes were not being paid and if (3) he was in a position to find out for certain very easily." *Id.* at 18. Such a fact pattern is present, the court found, when a responsible party has failed "to investigate or to correct mismanagement after having notice that withholding taxes have not been remitted to the government. . . . This requires a finding that the responsible person had 'notice' that the taxes had not been remitted in the past." *Id.* (citing *I.R.S. v. Blais,* 612 F.Supp. 700, 710 (D.Mass.1985)).

## IV. Analysis

### A. *Whether the Debtor Was a Responsible Party*

■ I must first determine whether the Debtor has demonstrated that he did not have the power or significant control over whether the taxes got paid. Because the Debtor has not provided uncontroverted evidence of his lack of responsibility to pay the taxes, I must determine whether he has overcome the presumptive correctness of the IRS assessment by refuting indicia of such responsibility.

■ The first indicium of whether the Debtor was responsible for paying taxes is whether he held a corporate office. I previously found that the Debtor was the treasurer of SLV and OI and at least a director of SLV during the time periods for which those corporations were liable for the tax obligations.[63]

■ In this circuit, holding of a corporate office is an indicium of liability but does not present a forgone conclusion. A corporate officer, however, cannot avoid liability under § 6672 simply by delegating the duty which corresponds with the office to another. *See Keller v. United States,* 46 F.3d 851, 854 (8th Cir.1995).

There was no evidence presented regarding the duties of the treasurer of OI or SLV. Because the Debtor did not produce or testify to an agreement to the contrary, *see Adams v. Coveney,* 162 F.3d 23, 28 (1st Cir.1998) (concluding that § 6672 liability would not attach based upon oral agreement with respect to officer responsibilities), in the position of treasurer the Debtor typically would have had the duty to pay bills, write checks, disburse payroll, withhold and pay taxes and address any other financial matters. *Thomsen,* 887 F.2d at 14. Although it appears from the testimony that the Debtor delegated these duties, such delegation does not relieve him of his responsibilities. *Id.* at 17.

Another indicium of responsibility is whether the Debtor held stock in the cor-

---

**63.** Because the First Circuit emphasizes the function over the title, I note that even if the Debtor is correct in recanting his prior sworn testimony, while he was involved in SLV and OI, he considered himself to be the treasurer.

poration which failed to pay taxes. A corporation of which the Debtor was a 40–45% shareholder was the sole shareholder of SLV and OI.[64]

Another indicium is whether the Debtor had the authority to disburse corporate funds. Other than the inadequate revenue, the testimony reflected that the Debtor was the primary provider of the corporate funds. The Debtor did not disburse the funds; bookkeepers held that responsibility. The Debtor did, however, on occasion direct how the funds were disbursed. Based upon his position as the "bank", his presence on site and his involvement in the affairs of the corporations, I conclude that he had the authority to disburse funds although he did not exercise that duty.

A fourth indicium is whether the Debtor had the ability to hire and fire. The Debtor stated that he only recommended prospective employees. As explained earlier, his actions bespeak this vague characterization. The Debtor hired Baron Management, the Debtor fired Pallatroni and the Debtor hired someone else after Baron left to manage the inn. The Debtor hired counsel to represent the corporations in bankruptcy. The employees looked to both the Debtor and O'Reilly as their bosses. The Debtor had the ability to hire and fire.

The Debtor's attempts to characterize his role as one of a passive investor belie his actions on the corporations behalf.[65]

As the testimony and evidence demonstrate that all of the indicia of responsibility exist and the Debtor has failed to establish otherwise, I find that the Debtor was a responsible party under § 6672.

### B. *Willfulness*

██ After having found him responsible, the question becomes whether the Debtor knew that the taxes were not getting paid and allowed other creditors to be paid.

The Debtor's testimony in this regard is replete with the phrase "I don't recall",[66] although he did testify that he was mailing money up to the corporations on a regular basis from 1990 onward for bills such as payroll. O'Reilly, conversely, testified that he and the Debtor discussed the issue of the unpaid payroll taxes frequently.[67] This testimony is consistent with the Debtor searching for a management company as a result of financial difficulties.[68] It is also consistent with the other employees who testified that the Debtor frequently visited Center Village and was informed of the financial situation. Based upon these facts, I conclude that the Debtor, at least, ought to have known that there was a grave risk that the payroll taxes were not being paid and was in a position to find out easily.[69] *See Thomsen*, 887 F.2d at 18. As such, I find that the Debtor willfully failed to pay the taxes for which he has been assessed.

---

64. *See* n. 6, 22.

65. In *Adams v. Coveney*, a case based upon state law in which the First Circuit considered how it would rule under federal law, the court stated that the debtor would not be liable under state law because he did not hold more stock than other directors, did not involve himself in legal and financial affairs and did not reserve power over other corporate matters. *See* 162 F.3d at 28. In that case, the debtor ran the restaurant and his partner was responsible for all matters legal and financial. As explained in the Finding of Facts, the Debtor's involvement in this case was not restricted to simply sending money when called.

66. 1T–49, 51, 54.

67. 2T–32.

68. The Debtor described the testimony as revealing that O'Reilly did not know of the unpaid taxes until 1992 and that the Debtor could only have found out that information through O'Reilly. O'Reilly, however, frequently stated that he was terrible with dates and described not being surprised when he received the assessments. 2T–50.

69. The facts do support a conclusion that the Debtor failed to correct mismanagement after having notice that the taxes had not been paid in the past.

## V. Conclusion

The Debtor has failed to overcome the presumptive correctness of the IRS' claim. As such, I will enter an order overruling his objection to that claim. I will schedule a separate hearing on the amount of that claim.